[No. S159690. Apr. 1, 2010.]

STOCKTON CITIZENS FOR SENSIBLE PLANNING et al., Plaintiffs and Respondents, v.
CITY OF STOCKTON et al., Defendants and Respondents;
A.G. SPANOS CONSTRUCTION, INC., et al., Real Parties in Interest and Appellants.

486

**COUNSEL**

Steefel, Levitt & Weiss, Judy V. Davidoff, Michael D. Early, Beth C. Tenney; Sheppard Mullin Richter & Hampton, Robert J. Stumpf, Jr., Arthur J. Friedman and Karin Dougan Vogel for Real Party in Interest and Appellant Wal-Mart Stores, Inc.

Briscoe, Ivester & Bazel, John Briscoe, Lawrence S. Bazel, Christian L. Marsh and Shona L. Armstrong for Real Party in Interest and Appellant A.G. Spanos Construction, Inc.

Cox, Castle & Nicholson, Michael H. Zischke and Scott B. Birkey for California Building Industry Association as Amicus Curiae on behalf of Real Parties in Interest and Appellants.

Remy, Thomas, Moose and Manley and Whitman F. Manley for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Law Offices of William D. Kopper, William D. Kopper; Kenyon Yeates, Charity Kenyon, J. William Yeates, Keith G. Wagner and Jason R. Flanders for Plaintiffs and Respondents.

Brandt-Hawley Law Group and Susan Brandt-Hawley for Planning and Conservation League as Amicus Curiae on behalf of Plaintiffs and Respondents.

Freeman, D'Aiuto, Pierce, Gurev, Keeling & Wolf, Maxwell M. Freeman, Thomas H. Keeling and Michael L. Gurev for Defendants and Respondents.

## OPINION

**BAXTER, J.**—The California Environmental Quality Act (CEQA or Act; Pub. Resources Code, § 21000 et seq.)[1] seeks to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve. On the other hand, the Act is sensitive to the particular need for finality and certainty in land use planning decisions. Accordingly, the Act provides "unusually short" limitations periods (Cal. Code Regs., tit. 14, §§ 15000 et seq. (CEQA Guidelines), 15112, subd. (a)) after which persons may no longer mount legal challenges, however meritorious, to actions taken under the Act's auspices.

The shortest of all CEQA statutes of limitations applies to cases in which agencies have given valid public notice, under CEQA, of their CEQA-relevant actions or decisions. The filing and posting of such a notice alerts the public that any lawsuit to attack the noticed action or decision on grounds it did not comply with CEQA must be mounted immediately.

Certain projects are statutorily exempt from CEQA, and these include "[m]inisterial projects"—those whose approval involves little or no exercise of discretion or judgment by the public agency. (§ 21080, subd. (b)(1) (section 21080(b)(1)); see CEQA Guidelines, § 15369.) If a local agency determines that a project it has approved or decided to carry out is exempt for this reason, it may file a "notice of [this] determination"—otherwise known as a notice of exemption, or NOE. (§ 21152, subd. (b) (section 21152(b)); see CEQA Guidelines, §§ 15062, 15374.) An action or proceeding alleging "that a public agency has improperly determined that a project is not subject to [CEQA]" must be commenced "within 35 days from the date of the filing" of the NOE. (§ 21167, subd. (d) (section 21167(d)); see CEQA Guidelines, § 15112, subd. (c)(2).)

Here, under the ostensible authority of a previously adopted master development plan (MDP) for a large urban tract, the City of Stockton (City), through the director of its Community Development Department (Director), purported to approve, as consistent with the MDP, the construction of a Wal-Mart Supercenter[2] on certain parcels within the tract. City then filed an NOE announcing its determination that the approval came within CEQA's exemption for ministerial actions.

---

[1] All further unlabeled statutory references are to the Public Resources Code.

[2] The Wal-Mart corporate name, and the form of the word "Wal-Mart" as it appears on company signage, have been altered several times in recent years. (See <http://walmartstores.com/AboutUs/8412.aspx; http://walmartstores.com/AboutUs/7603.aspx> [as of Apr. 1, 2010].) We use the forms employed by the company's attorneys in their briefs in this court.

Nearly six months later, plaintiffs filed this suit challenging the Wal-Mart approval under CEQA. To avoid the 35-day bar of section 21167(d), plaintiffs urge that, because the Director's "approval" was invalid and ineffective for various procedural and substantive reasons, the NOE was void and could not trigger the 35-day statute of limitations. Plaintiffs also contend the NOE itself was defective in form and content, and thus could not cause the 35-day limitations period to begin running.

The trial court and the Court of Appeal accepted such arguments, but we find them unpersuasive. We agree with appellants that flaws in the decision-making process underlying a facially valid and properly filed NOE do not prevent the NOE from triggering the 35-day period to file a lawsuit challenging the agency's determination that it has approved a CEQA-exempt project. By describing the project in question, setting forth the agency's action or decision, and detailing the reasons for the exemption finding, this notice tells the public that the brief period within which a CEQA challenge to the *propriety of the noticed action or decision* may be commenced has begun to run.

Plaintiffs' claim that an NOE can trigger the 35-day limitations period only if it announces a *valid* project approval runs counter to the principle that limitations periods apply regardless of the merits of the claims asserted, and do not depend on whether a timely action would have been successful. It also contravenes the purpose of notice-based statutes of limitations, as well as the Legislature's intent—clearly expressed in section 21167(d)—that suits claiming an agency has "improperly determined" a project to be exempt from CEQA must be brought within 35 days after an NOE that complies with CEQA requirements is filed.

Hence, plaintiffs' claims that the Director's approval action was procedurally flawed, and substantively mistaken, cannot delay commencement of the 35-day statute of limitations triggered by City's filing of the NOE. Plaintiffs were free to claim, in a lawsuit, that the underlying approval process failed to comply with CEQA, *but only if they commenced such litigation within 35 days after the NOE was filed.*

We also reject plaintiffs' assertion that the NOE itself was defective in form and content, and thus failed to trigger the 35-day limitations period. The NOE, we conclude, demonstrates minimal compliance with CEQA. Plaintiffs' CEQA claims, contained in a lawsuit filed more than 35 days after the NOE was filed, are therefore barred. Accordingly, we will reverse the judgment of the Court of Appeal.

## FACTS

A.G. Spanos Park is a 1,239-acre tract in northwest Stockton, bisected by Interstate 5 into 586-acre Spanos Park East and 653-acre Spanos Park West. In 1989, after completion of staged and supplemental environmental impact reports (EIR's), as required by CEQA, City had approved a plan for development of the entire tract that envisioned a mix of residential, commercial, recreational, and open-space uses. Spanos Park West would be divided into two broad components: a commercial component and a medium- to high-density residential component. The overall plan called for a total of 7,460 residential units, 2,983 of which were to be built in Spanos Park West. Thereafter, Spanos Park East was almost completely built out, and Spanos Park West was graded for residential development.

In 2001, due to changed market conditions, A.G. Spanos Construction, Inc. (Spanos), proposed revisions in the plan for Spanos Park West. Under the revised proposal, 138 acres, designated The Villages at Spanos Park West (Villages), and originally slated for high-density residential development, would be rezoned single-family residential and developed with low- to medium-density housing. Another portion, designated as the A.G. Spanos Business Park (Business Park), would be placed in a mixed-use, or MX, zone (Stockton Planning & Zoning Code, § 16-075 et seq.),[3] intended to encourage the multiple-use development of large tracts, including high-density residential, business, professional, and retail, as set forth for each site in an MDP.

An MDP was prepared for the Business Park. The MDP declared it was intended to serve as "the primary land use and regulatory document that establishes the standards and strategies used to guide the course of development for a flexible plan mixed use project." (MDP, § 1.1.) Included within the MDP was a land use summary for the entire Business Park tract, which "indicate[d] the recommended primary land use and *the range of land uses considered* for each conceptual parcel in the Plan Area." (*Id.*, § 3.3.1, italics added.) Four parcels within this zone, parcels 17, 17a, 18, and 19, comprising some 48 acres, were identified "primar[il]y" for multifamily residential development. (*Id.*, table 3-1, Land Use Summary.)

A recurrent theme of the MDP was ensuring the ability to respond to changing economic circumstances during the development process, within the limits of general land use guidelines. The MDP's stated purpose was "to create the framework of maximum flexibility for the development of the

---

[3] Throughout this opinion, we cite to Stockton city ordinances in the form supplied to us in the record on appeal. There are indications that sections of the Stockton Planning and Zoning Code herein cited may have been superseded. (See <http://qcode.us/codes/stockton/view.php?topic> [as of Apr. 1, 2010].)

Business Park while remaining consistent with the policies, general land uses and programs of the City's General Plan." (MDP, § 1.3.) Thus, the land use summary described above was said to "represent[] a *possible* pattern of uses that respond to market conditions and the developer's expectations *at a specific point in time.* Because of the inherent flexibility of the M-X zoning designation, the Conceptual Plan also represents a *range* of land use *options* that comply with the criteria established by the M-X Zone." (*Id.*, § 3.3.1, italics added.) Up to 225,000 square feet of "[r]etail" space was listed among optional uses for adjacent parcels 17a, 18, and 19. (*Id.*, table 3-1, Land Use Summary.)

Concurrently with the MDP, and in return for residential density concessions in the Villages area, Spanos was to execute a Density Transfer Agreement (Density Agreement). This agreement obligated Spanos to construct a minimum of 935 multifamily residential units within the Business Park. (Density Agreement, § 4.2.) Significant amendments to the MDP, and to the Density Agreement (*id.*, § 12.1), would require a noticed public hearing and legislative action by City's governing body. (Gov. Code, §§ 65867, 65867.5, 65868; Stockton Planning & Zoning Code, § 16-208.B.)

Once the MDP was adopted, an application for a project or use "that [was] not consistent with and [did] not share the same or similar characteristics of an allowed use identified within the [MDP]" could be approved only if the Business Park's design review board recommended that the City issue a conditional use permit, and thereafter City's planning commission issued such a permit. If the planning commission's decision to issue the permit was then appealed to the city council, the council could uphold the decision only if it found, upon substantial evidence, that the proposed project or use would not create internal inconsistencies within the MDP and was consistent with the Business Park's goals and objectives. (MDP, § 8.3.)

However, under the MDP (MDP, § 8.2) and provisions of City's zoning ordinance (see Stockton Planning & Zoning Code, § 16-208.F), the design review board and the Director were required to approve, on City's behalf, specific projects within the Business Park *if they determined these projects were consistent with the MDP's criteria, goals, and purposes.* A project approval by the Director could be appealed to the planning commission within 10 days. (MDP, § 8.4.)

A second supplemental EIR (the Spanos Park West SEIR) was prepared to evaluate the environmental implications of the revised Spanos Park West proposal. On January 29, 2002, after a duly noticed public hearing, the city council certified the Spanos Park West SEIR, made the necessary zoning changes, adopted the requisite amendment of City's general plan, and approved the MDP and the Density Agreement.

In the fall of 2003, Doucet & Associates (Doucet), acting on behalf of appellant Wal-Mart Stores, Inc. (Wal-Mart), submitted to the design review board a detailed proposal and plans for a 207,000-square-foot retail store to be sited on parcels 17 and 17a of the Business Park, comprising some 22.38 acres. By a letter of October 29, 2003, the design review board advised the Director that, in the board's opinion, "[t]he above project submittal is consistent and the design of the proposed retail development is in accordance with the standards and guidelines associated with the [MDP]."

On December 15, 2003, the Director wrote to Doucet, stating that "[i]nitial staff review of the above-noted plans has been completed and it has been determined that [they] are in substantial conformance with the Spanos Park West Master Development Plan," subject to five minor listed "corrections." The face of the December 15, 2003, letter indicates that copies were sent to Spanos, and to various City officials, including a deputy planning director, a plan check engineer, an assistant fire marshal, a senior environmental control officer, program managers in the City Public Works and Economic Development Departments, and a parks facility planner.

In a letter to the Director dated the next day, December 16, 2003, Spanos reported that it had constructed 308 of the 935 MX-zone multifamily residential units required by the Density Agreement, but that "due to high market demand for [c]ommercial [p]roperties, Spanos presently lack[ed] the space" within the zone to accommodate the additional 627 units. The letter therefore asked that construction of those units be postponed pending revision of City's general plan, and it offered Spanos's "assur[ance]" that the company would build the additional units, within 10 years, at other City locations. The Director countersigned the letter as "[a]pproved this 17th day of December, 2003."

On February 5, 2004, Judy Davidoff, an attorney at Steefel, Levitt & Weiss, wrote the Director on behalf of Wal-Mart. The Davidoff letter indicated "our understanding" that the Director's December 15, 2003, letter to Doucet constituted his approval of the plans for the construction of a retail store within the Business Park. Noting that section 8.4 of the MDP permitted an appeal to the planning commission within 10 days of the Director's decision approving such a project, the letter sought to "confirm that your December 15, 2003, letter was the 'decision' required by [s]ection 8.2 for the above project," and that the time for appeal of the decision had therefore passed. As confirmation, the letter asked the Director to initial and return an enclosed copy. In this mandate proceeding, the Director has declared that he

initialed and returned the copy as requested, thus confirming he had approved the project as consistent with the MDP.[4]

On February 17, 2004, City, through the Director, filed with the county clerk an NOE for the project.[5] The "Project Title," as set forth in the NOE, was a "Site Plan, Grading Plan, Landscape Plan, Building Evaluations and Design Approval under the Spanos Park West Master Development Plan." The NOE identified Doucet as the project "applicant," named Spanos as the "property owner," and described the location of the project—the Business Park—as "a fully entitled master planned development governed by" an MDP adopted in January 2002. According to the NOE, "the primary goal of the [MDP] is to create a mix of [high quality] compatible commercial businesses and office space." The specific subject of the NOE was described as a "retail use" to be constructed in two phases—the first of 138,722 square feet, and the second of 68,888 square feet—on parcels totaling some 22.38 acres. The NOE indicated that the project was located in an MX zoning district and that the "property's primary land use designation is commercial." Wal-Mart was not named in the NOE, and the project was not identified as a Wal-Mart Supercenter. The NOE declared that "[t]he [p]roject is consistent with the Development Standards set forth in the [MDP] and the proposed retail use and site layout meets the intent and standards of the [MDP] as well as the City of Stockton's General Plan and zoning regulations."

In larger, boldface lettering, the NOE included the following additional notification: "This is to advise that the City of Stockton Community Development Director, as directed and authorized under the Spanos Park West Master Development Plan (MDP1-00) has determined that the Site Plan, Grading Plan, Landscape Plan, Building Elevations and Design applicable to the Project conform to the standards set forth in the Spanos Park West Master Development Plan, which determination is a ministerial action not subject to CEQA review under Public Resources Code Section 21080(b)(1) and CEQA Guidelines Section 15369."

---

[4] The administrative record does not include a copy of the Davidoff letter, as initialed and returned by the Director. While there are limits on the admissibility, in CEQA mandamus actions, of evidence, such as the Director's declaration, not contained in the administrative record (see generally *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268]), such evidence does appear to be admissible "in traditional mandamus actions challenging ministerial or informal administrative actions if the facts are in dispute." (*Id.*, at p. 576, fn. omitted.)

[5] The record contains no indication that the planning commission, the city council, or the public received any notice of the submittal of the Wal-Mart plans to the design review board, the review board's letter to the Director dated October 29, 2003, the Director's letter to Doucet dated December 15, 2003, Spanos's request, dated December 16, 2003, to postpone and relocate Spanos's housing obligation, the Director's approval of this request dated December 17, 2003, the Davidoff letter of February 5, 2004, or the Director's confirmatory action in response to the Davidoff letter. Appellants apparently concede that no such notice occurred.

On February 24, 2004, Doucet applied for a use permit for off-sale of alcoholic beverages at the site of the proposed project. An attachment to the permit application again described the project as a 207,000-square-foot retail store, to be built in the Business Park in two stages. The attachment recited that staff had reviewed the proposed construction plans, and had determined they were consistent with City's zoning ordinance and the MDP.

The 35-day period following the filing of the NOE expired on March 23, 2004.[6] On March 15, 2004, well within that period, William D. Kopper, plaintiffs' attorney, wrote to City requesting that he be put on the notice list "for the proposed Wal-Mart Supercenter at the southwest corner of 8-Mile Drive and Interstate 5." Kopper's letter asked for "notice of Wal-Mart's application to build a Supercenter at this site, a copy of all staff reports, and the notice of any hearings."

On July 22, 2004, plaintiffs Stockton Citizens for Sensible Planning, Rosemary Atkinson, Paul Diaz, and Susan Rutherford Rich filed in San Joaquin County Superior Court a verified petition for writ of mandate. City and its council were named as defendants. Spanos, Doucet, and various "Does" were named as real parties in interest. By stipulated order, Wal-Mart was later added as a named real party in interest.

In its principal cause of action, the petition alleged that defendants and real parties in interest had violated CEQA by proceeding with the Wal-Mart project without obtaining a new EIR to assess its environmental effects. According to the petition, though City's staff had determined the project to be consistent with the previously approved MDP for Spanos Park West, as addressed in the 2002 Spanos Park West SEIR, the new plan would allow a 207,000-square-foot retail store to be constructed on parcels designated by the MDP as primarily for high-density residential development. Thus, the petition asserted, the Wal-Mart project represented, in fact, a substantial deviation from the design, goals, and purposes of the MDP, and created new environmental issues not adequately addressed by the existing environmental study.[7]

City, Spanos, Doucet, and Wal-Mart demurred to the CEQA claims, and moved to strike them, on grounds they were untimely, because the suit had

---

[6] Because 2004 was a leap year, February had 29 days, rather than 28.

[7] The petition did not mention the NOE. According to the petition, "[t]he site plan for the Wal-Mart Supercenter, the Wal-Mart Supercenter itself, and all other permits [for the project] were administratively approved by City of Stockton staff," but the first public review of the project occurred at the planning commission meeting of April 8, 2004, when staff asked the commission to approve the application for a use permit allowing the off-sale of alcohol. Further, the petition declared, the issuance of this permit "was the only discretionary action of the City that was publicly noticed."

not been commenced within 35 days after the filing of the NOE. The trial court overruled the demurrers and denied the motions to strike. The court reasoned that the CEQA limitations issue depended on whether the Director's December 15, 2003, letter to Doucet constituted City's "approval" of the project, an issue that could not be decided on the face of the pleadings.

Ultimately, the trial court rejected the limitations defense on the merits and issued a peremptory writ of mandate, ordering City to set aside all approvals and permits for the Wal-Mart project, and to prepare a new EIR addressing the project's environmental implications. On the limitations issue, the court reasoned as follows: City's filing of the NOE could start the running of the shortened 35-day CEQA statute of limitations only if the NOE gave notice that City had "approve[d]" a project it deemed to be exempt from CEQA. (§ 21152(b).) The Director's December 15, 2003, letter to Doucet, upon which the NOE was based, was not such an "approv[al]" for several reasons: First, the letter was entitled "Status Report." Second, it was only a letter, "not a formal order of approval." Third, it included five conditions that required further action by the applicant. Fourth, it found that the submitted proposal was only in "substantial" compliance with the MDP. Accordingly, the court concluded, plaintiffs had "a six-month period" to file suit, and their action was thus timely.[8]

Spanos and Wal-Mart appealed, again asserting the CEQA claims were untimely under the 35-day limitations period of section 21167(d). In a split decision, the Court of Appeal for the Third Appellate District affirmed.

The majority held that the NOE filed February 17, 2004, could trigger the 35-day statute of limitations only if it evidenced "approval" of a project that had been given by a "public agency." (§§ 21152(b), 21167(d); CEQA Guidelines, §§ 15062, subd. (a), 15112, subd. (c)(2).) Appellants claimed the Director's letter to Doucet of December 15, 2003, was City's "approval" of the Wal-Mart Supercenter project. However, the majority held, the letter was not a valid "approval" by a "public agency."

On the issue whether the Director's letter was an "approval," the majority reasoned as follows: Under the CEQA Guidelines, the timing of an agency's

---

[8] The court's "six-month" reference was apparently to that portion of section 21167(d) providing that if no NOE has been filed in connection with a public agency's approval of a project, and the agency has taken no other CEQA-based action before allowing the project to proceed, an action alleging noncompliance with CEQA shall be commenced "within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project." (See also CEQA Guidelines, § 15112, subd. (c)(5)(A), (B).) The court did not indicate when it thought the 180-day period had commenced, but it obviously concluded this had occurred within 180 days before the suit's filing date of July 22, 2004.

"approval" of a project is a matter determined by the agency's own rules, regulations, and ordinances. (CEQA Guidelines, § 15352, subd. (a).) The MDP for Spanos Park West allowed "[a]ny interested person" to appeal a decision of the Director to City's planning commission within 10 days. But there is no evidence the Director's letter was posted, published, or otherwise made known to the public within the appeal period so this right could be exercised. Moreover, as the trial court found, the letter was labeled a "Status Report," thus failing to inform the public that it was intended as a final project approval. Additionally, the letter did not disclose that the store at issue would be a Wal-Mart or would displace high-density housing required by the Density Agreement, nor did the letter include "other information that would have put the public on notice of the nature and consequences of the project." Hence, the letter did not conform to local rules governing the Director's approval of projects under the MDP, and could therefore not constitute such an approval.

As to whether approval had been given by a "public agency," the majority reasoned as follows: Neither CEQA, City's ordinances, nor the MDP permitted City to "delegate" a decision with significant environmental effects to the Director. Under CEQA, an agency may assign decisionmaking authority to anyone within the agency "permitted by law" to make such a decision, but this does not extend to approval of a project with environmental consequences. (Citing CEQA Guidelines, § 15356.) Similarly, the MDP allowed the Director to approve a project that substantially conformed to the MDP, and thus had already been subject to an environmental study, but not one that had environmental consequences not previously considered. In other words, the MDP "does not grant authority to the Director to determine his own jurisdiction and hence does not authorize the Director *to mistakenly find that the project is within the MDP.*" (Italics added, fn. omitted.) Accordingly, any purported "approval" by the Director was not the approval of a "public agency," i.e., City.

In dissent, Justice Nicholson asserted that the majority had wrongly considered supposed *procedural defects* in the Director's approval letter, as well as the *merits* of his approval decision, to conclude that the 35-day CEQA limitations period had not begun running, and thus had not expired. For purposes of CEQA, the dissent noted, a project "approval" is "the decision by a public agency which commits the agency to a definite course of action in regard to a project." (CEQA Guidelines, § 15352, subd. (a).) Whatever the form and content of the Director's letter, the dissent observed, the letter had the actual and intended effect of a ministerial project approval; it bound City to allow the project to proceed. Only further ministerial actions, such as the issuance of a building permit, were necessary before construction could begin. CEQA, the dissent insisted, does not require public notice of a ministerial approval, nor does it require the approval to contain any particular

information. Certainly, the failure to give public notice of the Director's approval within the 10-day period provided by the MDP for appeal to the planning commission excused any failure to exhaust that administrative remedy. However, the dissent concluded, this omission did not prevent the 35-day period for filing a *lawsuit* from commencing once the NOE, which *did* give public notice of the Director's ministerial decision, was filed with the county clerk.

Moreover, the dissent reasoned, the majority had erred by basing its statute of limitations analysis on the premise that the Director *lacked authority* to approve, as consistent with the MDP, a project which *in fact* did not conform to the MDP and therefore required further environmental study. Both CEQA and the MDP itself, the dissent pointed out, permitted City to delegate to staff—in this case, the Director—the authority to make ministerial decisions. As the dissent noted, the merits of the Director's determination that approval of the Wal-Mart project was a mere ministerial action without CEQA implications was open to challenge in a timely CEQA action. However, the dissent concluded, the statute of limitations on a lawsuit alleging that "a public agency has *improperly* determined" a project is exempt from CEQA begins to run when the agency files a notice of this determination—an NOE—with the county clerk, and the limitations period expires 35 days later. (§ 21167(d), italics added; see CEQA Guidelines, § 15112(c)(2).) Because plaintiffs had not brought their CEQA claims within that time, the dissent asserted, those claims were barred.

On review, we disagree with the result reached by the Court of Appeal majority.

## DISCUSSION[9]

As below, plaintiffs urge on multiple grounds that the NOE filed by City on February 17, 2004, did not trigger the 35-day CEQA limitations period set forth in section 21167(d). Here, as in the Court of Appeal, plaintiffs insist that because of various procedural and substantive flaws in the purported process of approving the Wal-Mart project, such an "approval"—a prerequisite to a valid NOE—never actually occurred prior to the filing of the NOE.

To address these contentions, we first examine the relevant provisions of CEQA. Then we consider how principles governing statutes of limitations, and the CEQA limitations period in particular, properly apply to the facts

---

[9] Amicus curiae briefs have been filed on plaintiffs' behalf by the Planning and Conservation League, and on appellants' behalf by (1) the League of California Cities and California State Association of Counties and (2) the California Building Industry Association.

presented here. Having done so, we disagree with plaintiffs' arguments. We harbor no doubt, on these facts, that the 35-day limitations period had indeed begun to run, and had expired before plaintiffs filed their lawsuit. Hence, we conclude, plaintiffs' CEQA claims are untimely.

■ CEQA generally provides that, before a public agency carries out or approves any discretionary project—i.e., any activity that requires the exercise of agency judgment or deliberation and foreseeably may cause physical damage to the environment—the agency must first assess the project's potential environmental effects. (§§ 21065, 21080, subd. (a), 21100, 21151; CEQA Guidelines, § 15357.) If, after initial study, the agency determines that the project will have no significant environmental effect, the agency may file a "negative declaration" reciting this determination, and further compliance with CEQA is then excused. (§ 21064, 21080, subd. (c); CEQA Guidelines, §§ 15063, 15070 et seq.; see, e.g., *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 270 [54 Cal.Rptr.3d 116].) Otherwise, the agency must prepare or obtain, and consider, an EIR that assesses the potential environmental impacts of the project as proposed, sets forth any feasible, less harmful alternatives to the project, and identifies any feasible mitigation measures. (§§ 21000 et seq., 21151 et seq.) The agency may not thereafter approve the project as proposed if there are feasible alternatives or mitigation measures that would avoid or substantially lessen the adverse environmental effects. (§ 21002.)

■ However, CEQA expressly exempts certain projects from its reach. Among these are "[m]inisterial projects" (§ 21080(b)(1))—those whose approval or implementation "involv[es] little or no personal judgment by the public official as to the wisdom or manner of carrying out the project." (CEQA Guidelines, § 15369.) For example, "[a] building permit is ministerial if the ordinance requiring the permit limits the public official to determining whether the zoning allows the structure to be built in the requested location, the structure would meet the strength requirements in the Uniform Building Code, and the applicant has paid his fee." (*Ibid.*)

If a local agency determines that a project is exempt under section 21080, subdivision (b), "and the . . . agency approves or determines to carry out the project," the agency "may file [an NOE] with the county clerk of each county in which the project will be located." (§ 21152(b).) The NOE, which is not to be filed until after the project has been approved, should include a brief description of the project; its location; a finding that the project is exempt from CEQA, citing the appropriate statute or CEQA Guidelines section; and a brief statement of reasons to support the finding of exemption. Copies of the NOE, once filed, must be available for public inspection. The notice must be posted within 24 hours of receipt by the county clerk's office and must

remain posted for 30 days, after which the county clerk must return it to the agency. (§ 21152, subd. (c); CEQA Guidelines, § 15062.) "An action or proceeding alleging that a public agency *has improperly determined* that a project is not subject to this division [i.e., is exempt from CEQA] pursuant to [section 21080, subdivision (b)] . . . *shall be commenced within 35 days from the date of the filing . . . of the [NOE] authorized by . . . [section 21152(b)]*." (§ 21167(d), italics added; see also CEQA Guidelines, § 15112, subd. (c)(2).)

■ Among the purposes of statutes of limitations are to prevent stale claims, give stability to transactions, protect settled expectations, promote diligence, encourage the prompt enforcement of substantive law, and reduce the volume of litigation. (E.g., *Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 872 [127 Cal.Rptr.2d 113]; see *Hebrew Academy of San Francisco v. Goldman* (2007) 42 Cal.4th 883, 894 [70 Cal.Rptr.3d 178, 173 P.3d 1004]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 395 [87 Cal.Rptr.2d 453, 981 P.2d 79]; *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 787 [157 Cal.Rptr. 392, 598 P.2d 45].) A statute of limitations " 'necessarily fix[es]' a 'definite period[] of time' [citation], and hence operates conclusively across-the-board. It does so with respect to *all* causes of action, both those that do not have merit and also those that do. [Citation.] That it may bar meritorious causes of action as well as unmeritorious ones is the 'price of the orderly and timely processing of litigation' [citation]—a price that may be high, but one that must nevertheless be paid." (*Norgart, supra,* at p. 410, fn. omitted; see generally *Chase Securities Corp. v. Donaldson* (1945) 325 U.S. 304, 314 [89 L.Ed. 1628, 65 S.Ct. 1137] [operation of statute of limitations "does not discriminate between the just and the unjust claim"].)

To ensure finality and predictability in public land use planning decisions, statutes of limitations governing challenges to such decisions are typically short. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 27 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; see also, e.g., *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 774–775 [16 Cal.Rptr.3d 404, 94 P.3d 538].) The limitations periods set forth in CEQA adhere to this pattern; indeed, as the CEQA Guidelines themselves assert, "CEQA provides *unusually short* statutes of limitations on filing court challenges to the approval of projects under the act." (CEQA Guidelines, § 15112, subd. (a), italics added.) As the CEQA Guidelines further explain, "[t]he statute of limitations periods are not public review periods or waiting periods for the person whose project has been approved. The project sponsor may proceed to carry out the project as soon as the necessary permits have been granted. The statute of limitations cuts off the right of another person to file a court action challenging approval of the project after the specified time period has expired." (CEQA Guidelines, § 15112, subd. (b).)

■ CEQA's purpose to ensure extremely prompt resolution of lawsuits claiming noncompliance with the Act is evidenced throughout the statute's procedural scheme. Such suits have calendar preference; more populous counties must designate one or more judges to develop CEQA expertise so as to permit prompt disposition of CEQA claims; and expedited briefing and hearing schedules are required. (§§ 21167.1, 21167.4.)

Courts have often noted the Legislature's clear determination that " 'the public interest is not served unless CEQA challenges are promptly filed and diligently prosecuted.' " (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 111 [56 Cal.Rptr.3d 728]; see *Nacimiento Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (2004) 122 Cal.App.4th 961, 965 [18 Cal.Rptr.3d 921]; accord, *Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 836 [28 Cal.Rptr.2d 560]; *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 741 [231 Cal.Rptr. 910] (*Oceanside Marina Towers*).) "Patently, there is legislative concern that CEQA challenges, with their obvious potential for financial prejudice and disruption, must not be permitted to drag on to the potential serious injury of the real party in interest." (*Board of Supervisors*, *supra*, at p. 837.) "The Legislature has obviously structured the legal process for a CEQA challenge to be speedy, so as to prevent it from degenerating into a guerilla war of attrition by which project opponents wear out project proponents." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 12 [6 Cal.Rptr.3d 286], italics omitted.)

■ CEQA reserves its very shortest limitations periods for cases where the agency has given public notice, in a form required or permitted by the statute, of an agency act or decision that is relevant to CEQA's statutory scheme. Thus, where the agency approves a project without determining whether it will have a significant effect on the environment (and therefore presumably filing no CEQA notice), the limitations period is 180 days from project approval or, if there was no formal approval, 180 days from the commencement of construction. (§ 21167, subd. (a).) On the other hand, an action asserting that the agency has improperly determined whether a project subject to CEQA will have a significant environmental effect must be commenced within 30 days after the agency files the required notice of project approval (which notice must indicate the agency's determination about the project's effect on the environment). (§§ 21108, subd. (a), 21152, subd. (a), 21167, subd. (b).) A suit claiming that an EIR prepared for the project, or any other act or omission by the agency, does not comply with CEQA must be filed within 30 days after the above described notice of project approval is filed. (§ 21167, subds. (c), (e).)

█ Finally, when an agency determines that a project it has approved or decided to carry out is statutorily *exempt* from CEQA, the agency *may* file an NOE indicating that determination, as authorized by section 21152(b). If the agency does not file an NOE, a lawsuit claiming that the exemption determination was "improper[]" may be filed within 180 days of project approval or, if there was no formal approval, within 180 days from the commencement of construction. (§ 21167(d).) But if, as indicated above, the agency *does* file an NOE as authorized by section 21152(b), any lawsuit claiming that the agency has "improperly determined" the project is statutorily exempt "shall be commenced within 35 days from the date of the [NOE]." (§ 21167(d).)

█ Here we must decide whether, as appellants contend, a facially valid and properly filed NOE, stating that a public agency has approved a project under a CEQA exemption, automatically triggers the 35-day statute of limitations for CEQA challenges to the approval process, or whether, as plaintiffs and the Court of Appeal majority have suggested, flaws in the approval process itself negate the resulting NOE, which therefore cannot cause the 35-day limitations period to begin. For a number of reasons, we agree with appellants.

First, as appellants argue, the analysis advanced by plaintiffs and the Court of Appeal majority confuses the *timeliness* of a lawsuit with its *merits*. Such an approach is contrary to the principle, set forth above, that a statute of limitations applies regardless of the merits of the underlying lawsuit.[10]

Second, CEQA's particular limitations scheme refutes the theory advanced by plaintiffs and accepted by the Court of Appeal majority. CEQA establishes and emphasizes *public notification* of an agency's action or decision as the event triggering the shortest applicable limitations periods for lawsuits alleging noncompliance with the statute.

---

[10] Plaintiffs dispute appellants' assertion that they are litigating the merits of their CEQA challenge as a defense against the statute of limitations. Plaintiffs do not, they assert, claim that section 21167(d)'s 35-day limitations period is inapplicable because the Director's decision afforded the wrong level of environmental review under CEQA—the issue they raise on the merits—but because of *other* flaws in the Director's purported project "approval" that have nothing to do with the Act. Nonetheless, plaintiffs essentially rely on the circular premise that a limitations period to challenge the validity of an agency decision is inapplicable if the agency decision is invalid. In any event, even were we to accept plaintiffs' disclaimer, we would still conclude, for the reasons herein set forth, that plaintiffs' effort to avoid the 35-day limitations period fails. As we explain at length herein, persons seeking to challenge an agency decision on CEQA grounds may not, for purposes of the statute of limitations, go behind the agency's declaration in an NOE that it *has* approved a project. Instead, they must bring their action within 35 days after the NOE is filed and posted. Nor does this mean that the agency may therefore file an NOE *in advance* of an actual project approval, then proceed unmolested to approve the project at its leisure, free of environmental challenges. In a suit brought within 35 days after the filing of the NOE, litigants are free to argue *on the merits* that the NOE did not comply with CEQA, in that it did not follow a valid project approval.

The reasons for this approach are clear. Public notification serves the public's right, under CEQA, to be informed of, and to have a voice in, the process of evaluating the environmental issues surrounding a contemplated action or decision. (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 938 [231 Cal.Rptr. 748, 727 P.2d 1029] (*Concerned Citizens of Costa Mesa*).) By the same token, such notification, provided in the form and manner specified by the statute, sufficiently advises interested persons of the action or decision so as to trigger the limitations period for lawsuits asserting that the agency has proceeded in violation of CEQA. (*Oceanside Marina Towers, supra*, 187 Cal.App.3d 735, 741–742.) Where constructive notice is provided by this overt means, the statute contemplates that lawsuits making such claims thereafter will be filed expeditiously.

■ The express statutory language of section 21167(d)—the most reliable indicator of the Legislature's intent (e.g., *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888 [80 Cal.Rptr.3d 690, 188 P.3d 629])—strongly confirms that litigation challenging the *validity* of an agency's determination to allow a project to proceed under a CEQA exemption must be *timely*, and that the shortest applicable period of timeliness is measured from the date on which an NOE setting forth that determination is filed. Section 21167(d) provides, in pertinent part, that "[a]n action or proceeding alleging that a public agency *has improperly determined* that a project is not subject to this division . . . *shall be commenced within 35 days* from the date of the filing by the public agency . . . of the *notice* authorized by . . . subdivision (b) of [s]ection 21152." (Italics added.) Thus, under the explicit statutory terms, claims of *impropriety* in the agency's exemption determination may only be addressed in lawsuits commenced within 35 days after the agency properly files a *notification* of that determination, i.e., an NOE.

By contrast, section 21167(d) establishes a much longer limitations period for cases in which constructive notice of the agency's exemption determination is *not* provided by means of a filed NOE. Then, as we have seen, the relevant statute of limitations is 180 days from approval of the project, or, if there was no formal approval, 180 days from the commencement of construction.

As indicated above, this pattern appears throughout the CEQA limitations scheme. Where the agency files a notification, under CEQA, of an action it has taken, the public is thereby deemed alerted to the action. The limitations period for mounting a CEQA challenge to the validity of that action begins immediately and expires soon thereafter. Where no such notification is filed, the limitations period is longer, and its commencement may be delayed until the public has received constructive notice of the action by other means. This

disparity illustrates the importance the statute attaches to the filing of a *public notice* as a dispositive event requiring that any lawsuit challenging the agency's action thereafter be filed with particular speed.

The history of section 21167(d) also indicates the Legislature's purpose to place strict time limits on suits challenging a public agency's CEQA exemption determination once the agency gives public notice of such a determination by filing an NOE. As we recently explained, "[s]ection 21167 was added to the Public Resources Code in 1972, as part of a bill that also added the notice of determination provisions of sections 21108 and 21152. (Stats. 1972, ch. 1154, §§ 9, 12, 16, pp. 2275–2278.) As first enacted, section 21167 defined only the three limitations periods set forth in subdivisions (a) through (c). (Stats. 1972, ch. 1154, § 16, pp. 2277–2278.) Less than two years later, the Legislature amended section 21167 to add subdivisions (d) and (e). (Stats. 1974, ch. 56, § 3, pp. 125–126.) Assembly Bill No. 2338 (1973–1974 Reg. Sess.), which made these changes, was passed as an urgency measure to clarify the limitations periods for CEQA claims. (Stats. 1974, ch. 56, § 5, p. 126.)

"Two enrolled bill reports concerning Assembly Bill No. 2338 (1973–1974 Reg. Sess.) are of interest here. A Department of Water Resources report noted that, in addition to creating a new 35-day statute of limitations for challenges to exemption determinations, the bill also retained the 30-day statute of limitations for claims that challenge an agency's determination of environmental impacts or challenge the adequacy of an EIR. 'Thus,' the report concluded, '*essentially any determinations* made by public agencies under the Environmental Quality Act will be subject to a 30 or 35 day challenge limitation, *provided a notice of determination has been filed*. If no notice is filed or utilized, a 180-day period of limitation applies.' (Dept. of Water Resources, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973–1974 Reg. Sess.) Feb. 25, 1974.) A similar conclusion was drawn in an enrolled bill report prepared by the Governor's Office of Planning and Research, which has special expertise in interpreting the CEQA statutes. (See, e.g., § 21083 [directing the Office of Planning and Research to develop the [CEQA] Guidelines].) This report noted that, *in addition to providing a 35-day statute of limitations for exemption determinations*, Assembly Bill No. 2338 '[r]equires that any action alleging that any act or omission of a public agency does not comply with the provisions of CEQA must be commenced within 30 days after the required filing of notice.' (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973–1974 Reg. Sess.) Mar. 1, 1974.)" (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 49–50 [105 Cal.Rptr.3d 181, 224 P.3d 920], italics added, fns. omitted.)

Plaintiffs, however, point out that, under section 21152(b), the filing of an NOE—the triggering event for the 35-day limitations period—may occur only "[w]henever a local agency determines that a project is not subject to this division pursuant to subdivision (b) of [s]ection 21080 [the 'ministerial approval' exemption] . . . , *and the local agency approves or determines to carry out the project . . . .*" (Italics added; see also CEQA Guidelines, §§ 15062(a) [NOE shall be filed, if at all, "after approval of the project"], 15374 [NOE may be filed after public agency has decided to carry out or approve a project and has determined that the project is ministerial, and thus exempt from CEQA].) Accordingly, plaintiffs assert, unless the agency has *validly* "approved" a project, its filing of an NOE has no force or effect and cannot cause the 35-day limitations period to begin. The Court of Appeal majority accepted this theory.

■ But this approach would circumvent the clear legislative policy that the shortened limitations periods for CEQA challenges should apply whenever an agency has given *public notice* of its CEQA-related actions or determinations. Even when an agency had *intended* to finally approve the project under a CEQA exemption, and had given public notice of that action as contemplated by CEQA, a meritorious CEQA challenge to the approval would never be subject to the intentionally short notice-based limitations period provided by the statute. That is not what the Legislature intended. On the contrary, and consistent with the principle that statutes of limitations apply equally to well- and ill-founded suits, the Legislature meant to specify that *all* CEQA challenges to an agency's exemption determination, even those with merit, must be brought within 35 days after the agency files a compliant NOE.

The approach advanced by plaintiffs and accepted by the Court of Appeal majority was persuasively rejected under analogous circumstances in *California Manufacturers Assn. v. Industrial Welfare Com.* (1980) 109 Cal.App.3d 95 [167 Cal.Rptr. 203] (*California Manufacturers*). There, the Industrial Welfare Commission (Commission) promulgated orders regulating wages, hours, and working conditions in several industries. The Commission filed a CEQA notice of determination, and a negative declaration, in connection with its issuance of the orders. A trade association sought to invalidate the orders, urging, among other things, that the Commission had violated CEQA by failing to conduct an initial environmental investigation before filing the negative declaration. The trial court found that the association's CEQA claims were barred by the 30-day statutes of limitations set forth in subdivisions (b) and (e) of section 21167.

The Court of Appeal affirmed. The court dismissed the association's contention that, because the Commission had not undertaken the investigation

required by law, the notice of determination and the negative declaration were invalid and void, and thus could not trigger the notice-based limitations periods set forth in section 21167.

As the Court of Appeal observed, "the association's argument amounts to a contention that only if the agency has filed valid notices of determination and negative declarations will the 30-day statute apply. This flies in the face of the clear language of the statutes which provide that they apply in [subdivision] (b), where it is alleged that the agency has 'improperly determined' whether there will be a significant impact and in [subdivision] (e), where it is alleged that [an] agency action or omission 'does not comply' with statutory requirements." (*California Manufacturers, supra,* 109 Cal.App.3d 95, 125.) "It seems rather obvious," said the Court of Appeal, "that subdivision (a), the 180-day statute, applies where the agency proceeds without any attempt at compliance, and (b) and (e) apply where compliance is alleged to be defective. This interpretation also makes sense, in that, if an agency proceeds without any effort to comply, interested parties are less likely to receive early notice of the action than where there has been even an insufficient effort to comply." (*Ibid.*)

Similar principles apply here. Whatever the actual defects or flaws in its process of approving the Wal-Mart project under a CEQA exemption, City attempted, by filing an NOE for the project, to comply with CEQA. Section 21167(d) makes clear that suits claiming a project was "improperly" approved as exempt from CEQA must be brought within the 35-day period after an NOE is filed and posted. This short limitations period, based on the fact the agency formally notified the public of its CEQA action, may not be avoided on grounds that the flaws in the approval process invalidated and nullified the NOE.

 Accordingly, we are persuaded that when a properly filed NOE complies in form and content with CEQA requirements and declares the agency has taken an action that would constitute final approval of a project under a CEQA exemption, the 35-day period for *challenging the validity* of this asserted approval under CEQA begins to run. Such a conclusion honors both the language and the intent of section 21167(d), which specifies a 35-day limitations period for lawsuits claiming that a public agency "has *improperly* determined" a project is exempt from CEQA. (Italics added.)[11]

 Under CEQA, "approval" of a project is "the decision by a public agency which commits the agency to a definite course of action in regard to a

---

[11] We note that even where a *notice-based* CEQA statute of limitations is not at issue, an agency error in determining that a project is exempt from CEQA "does not generally preclude or delay the running of the 180-day limitations period." (*City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1720, fn. 4 [29 Cal.Rptr.2d 89].)

project intended to be carried out by any person." (CEQA Guidelines, § 15352, subd. (a); see *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 128–129 [84 Cal.Rptr.3d 614, 194 P.3d 344].) "With private projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (CEQA Guidelines, § 15352, subd. (b).) No particular form of approval is required.

Here, no party seriously disputes that City *intended* the Director's letter of December 15, 2003, to constitute its final approval of the Wal-Mart project. City evidenced this intent by filing an NOE for the project. As the Court of Appeal dissent indicated, there is no indication that any further approvals, other than ministerial building permits, were necessary to build the store. On the assumption construction of the Wal-Mart Supercenter had been finally approved, City's planning commission next entertained an application for an off-sale liquor permit for the store.

Plaintiffs, like the Court of Appeal majority, point out that under the CEQA Guidelines, "[t]he exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances." (CEQA Guidelines, § 15352, subd. (a).) The Director's purported approval, the argument runs, did not adhere to City's rules, because no public notice was provided in time to allow an administrative appeal of the Director's decision, and because the Director had no power under the MDP or City's zoning ordinance to approve, on City's behalf, a project that did not conform to the MDP and required new environmental study. Thus, plaintiffs and the Court of Appeal majority appear to assert, the "exact date" of approval did not occur by virtue of the Director's action, and the ensuing NOE was therefore void.

But again, the Director acted under the *ostensible* authority of the zoning ordinance and the MDP. He invoked those provisions of the MDP and the ordinance that *did* allow him to issue "ministerial" project approvals— approvals that substantially conformed to the MDP, required no new exercise of discretion or judgment, and did *not* call for new environmental study. Neither the MDP nor the ordinance expressly required City to give public notice of such an approval *before* filing the NOE. As the Court of Appeal dissent indicated, assuming such a prior-notice requirement was implicit in the MDP's provision for a 10-day right of appeal to the planning commission, the omission of such notice would, at most, excuse exhaustion of this administrative remedy before filing a lawsuit. (See § 21177, subd. (e).) Failure to give such notice could not, in and of itself, prevent commencement of the 35-day limitations period for bringing such a suit once the NOE was filed.

Nor, as we have indicated, could the Director's misuse, if any, of his "ministerial approval" authority prevent the commencement of the 35-day limitations period. In a suit filed within that period, plaintiffs would have been free to argue that the Director's "approval" under a CEQA exemption was "improper[]," and that the project was, in fact, not exempt from CEQA. But they failed to bring their suit within this time. Accordingly, their CEQA attack on the approval is barred.[12]

For the proposition that a valid NOE requires a valid project approval, the Court of Appeal majority relied heavily on *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931 [91 Cal.Rptr.2d 66] (*County of Amador*), but this decision is inapposite. In *County of Amador*, an irrigation district, seeking increased sources of water for its service area, became interested in obtaining from Pacific Gas and Electric Company (PG&E) the so-called project 184, whereby PG&E utilized three high Sierra Nevada lakes to store water and to release it as needed to generate hydroelectric power. In December 1994, the district adopted resolution No. 94-107. This resolution authorized the district's manager and general counsel to " 'prepare a conditional offer to PG&E' " for the purchase of project 184, to sign an agreement with the county for the exchange of certain confidential information, and to consult with adjacent counties before submitting an offer to PG&E. (*County of Amador*, at p. 964.)

Thereafter, in April 1995, the district filed an NOE for resolution No. 94-107, and in September 1995, it took steps to purchase project 184. More than 35 days after the NOE was filed, already pending mandate petitions were amended to challenge the NOE.[13] Ultimately, the trial court ordered, among other things, that the district set aside its NOE for the purchase of project 184.

---

[12] Plaintiffs observe that Spanos had agreed, in the Density Agreement, to build numerous high-density residential units in the Business Park, and they assert that parcels 17 and 17a, upon which the Wal-Mart Supercenter would be situated, were the only parcels still available for such residential construction. Hence, plaintiffs argue, a valid approval of the Wal-Mart project required, in turn, a valid amendment of the Density Agreement. (See Density Agreement, § 4.2.) Plaintiffs object that the Director's informal signoff on Spanos's December 16, 2003, request to defer this housing obligation to a later time and to a different, unspecified location did not meet the procedural requirements for such an amendment. (See Density Agreement, § 12.1; see also Gov. Code, §§ 65867.5, 65868.) However, this is but another effort to claim that a *procedurally flawed* approval cannot trigger the CEQA statute of limitations. On the contrary, though the issues plaintiffs raise could be pursued in a timely lawsuit, they do not avoid the 35-day limitations period triggered by the NOE.

[13] The previously filed mandate petitions challenged the adequacy of an earlier draft EIR prepared to assess a joint water rights application by the State Water Resources Control Board and the district for the stored water volume in these Sierra Nevada lakes.

On appeal, the district urged, inter alia, that the petitioners' attack on the NOE was untimely, but the Court of Appeal disagreed. The appellate court proceeded from the premise that an NOE should not be filed until after a project is approved, and that an "approval" is what "commits the agency to a definite course of action in regard to a project" (CEQA Guidelines, § 15352, subd. (a)). "Contrary to [the district's] contention," the Court of Appeal reasoned, resolution No. 94-107 "[did] not constitute project approval, as nothing in this resolution commits the district to purchasing Project 184. It is simply a resolution authorizing negotiations with that possibility in mind. It commits the district to exchanging confidential information, consulting with neighboring counties, and preparing an initial, conditional offer." (*County of Amador, supra,* 76 Cal.App.4th 931, 964.)

Whatever the merits of this reasoning, it is inapplicable to the instant case. *County of Amador* did not concern a purported final approval that was allegedly defective or inadequate, but an agency action that, on its face and by its own terms, authorized only preliminary steps toward a possible future project approval. Here, by contrast, aside from five minor "punch list" issues, the Director's letter to Doucet of December 15, 2003, undeniably constituted City's attempt to issue a final and unconditional grant of permission to construct the Wal-Mart project. Right or wrong, the letter's purpose was to commit City to a definite course of action in regard to Wal-Mart's application to build the store. The filing of an NOE with regard to this approval thus caused the 35-day limitations period to begin. All suits attacking the approval process as "improper[]" under CEQA must have commenced within that time.[14]

*Endangered Habitats League, Inc. v. State Water Resources Control Bd.* (1997) 63 Cal.App.4th 227 [73 Cal.Rptr.2d 388] (*Endangered Habitats League*), cited by plaintiffs, is not inconsistent with our conclusion. There, the County of Riverside (Riverside) adopted, in 1986, a master plan for resolving

---

[14] Similarly distinguishable is *Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118 [17 Cal.Rptr.2d 408]. There, in March 1991, an individual sought mandate to set aside the city's approval of a beachfront hotel project for failure to comply with CEQA. The city urged it had approved the project, thus triggering the 180-day limitations period of section 21167, subdivision (a), by means of an "Approval in Concept" issued in November 1989. The Court of Appeal agreed with the plaintiff that approval had occurred only upon issuance of a building permit for the project in November 1990. As the Court of Appeal noted, the Approval in Concept had included numerous substantive "Conditions of Approval" that anticipated serious traffic, sewage, groundwater, soil settlement, beach contamination, and aesthetic issues the project would be expected to engender. The developer had hotly debated several of these conditions, and some were subsequently modified. Here, by contrast, the conditions imposed in the Director's December 15, 2003, letter to Doucet indicated only minor concerns raised by the design review board. Moreover, it is notable that in *Miller,* although the city had issued an NOE in connection with the November 1989 Approval in Concept, the city made no claim that this NOE had triggered the 35-day limitations period of section 21167(d).

the flood drainage needs of a large county area. The overall plan included the proposed construction of drainage channels labeled lines F and F-1, located within the City of Murrieta (Murrieta). The plan contemplated that lines F and F-1 would have concrete-lined bottoms. It made clear, however, that the sizing, alignment, and location of the described facilities were general and preliminary, and that such issues would be more precisely addressed "at the time of design." A negative declaration for the 1986 master plan was adopted on May 6, 1986.

Over the next eight years, during which the project was significantly revised and scaled back, state and federal agencies whose approval to construct lines F and F-1 was required strenuously objected to the use of concrete, rather than "soft," or natural, channel bottoms, because of the adverse impact on riparian habitat. On November 1, 1994, after studying the soft-bottom option, Murrieta voted to adopt concrete bottoms for lines F and F-1. On January 19, 1995, California's Department of Fish and Game, the final state agency to sign off on the project, approved the concrete-bottom option in return for mitigation measures. The United States Army Corps of Engineers gave a similar approval on February 17, 1995.

Meanwhile, on February 11, 1995, the plaintiffs sued Riverside to challenge, on CEQA grounds, the approval of concrete bottoms for lines F and F-1. The trial court granted relief, concluding that the 1986 master plan and associated negative declaration were insufficient "project-specific" documents to authorize the construction of lines F and F-1.

On appeal, as in the trial court, Riverside argued that the suit was untimely because it was not commenced within 30 days after the filing of the 1986 negative declaration. The Court of Appeal disagreed, and reasoned as follows: The plaintiffs' objection was not to the broad concepts of the 1986 master plan, but to the more recent *site-specific implementation* of that plan with respect to lines F and F-1. At issue was the plaintiffs' claim that the final decision to employ concrete channel bottoms for lines F and F-1 required "second tier" environmental review, but it was not clear until February 1995 that Riverside would proceed with concrete bottoms. Moreover, since no *formal* implementing decision on construction of lines F and F-1 had ever been made by Riverside, the statute of limitations began to run only upon the commencement of construction of these channels, and expired 180 days later.

In any event, the Court of Appeal concluded, since CEQA does not contemplate "prophylactic" lawsuits, the plaintiffs were not required to file their challenge before the controversy had actually solidified. In the Court of Appeal's view, even if the plaintiffs knew, more than 180 days before suing, that Riverside wanted concrete bottoms for lines F and F-1, it was not clear

Riverside could proceed with such plans until it obtained final agency approvals in February 1995. Only then, the Court of Appeal reasoned, did the plaintiffs have an " 'accurate, stable and finite project description' " to challenge. (*Endangered Habitats League, supra*, 63 Cal.App.4th 227, 242.)

Our case, of course, differs from *Endangered Habitats League* in a crucial respect. Here, after issuing an approval for which "second tier" environmental review was arguably necessary, City gave *public notice* of that decision by means CEQA intends as the trigger of a short limitations period within which the approval might be challenged as "improper[]." Under CEQA's terms, this 35-day limitations period therefore began to run. Nor did City's filing of an NOE force plaintiffs to mount a premature, prophylactic lawsuit in order to avoid the bar of the statute of limitations. As indicated above, the Director's letter of December 15, 2003, represented City's final decision, correct or mistaken, that the Wal-Mart construction project could go forward. Unless a timely legal challenge to this decision was successful on the merits, nothing further was required to allow the construction process to commence. A true controversy regarding City's compliance with CEQA was thus presented, and expeditious filing of any challenge on that ground was necessary.

Nor does our decision in *Concerned Citizens of Costa Mesa, supra*, 42 Cal.3d 929 suggest that the merits of a CEQA challenge are a legitimate basis for determining when the CEQA limitations period has begun and ended. In that case, after a 1977 public hearing, a county fairgrounds operator prepared an EIR for a project to upgrade the fairgrounds. The plan included the installation of an outdoor amphitheater. Construction of the theater was completed in February 1983, and the first concert was held there on July 27, 1983. On January 20, 1984, a nearby residents association, and certain individual neighborhood residents, filed a mandate action alleging that the theater as built differed materially from the one described in the EIR. According to the petition, the site had been expanded from six to 10 acres, seating capacity had been substantially increased, and the stage had been reconfigured to face toward, rather than away from, the residential neighborhood, thus greatly increasing the neighborhood noise levels for theater events. The plaintiffs claimed the changes were made without public notice or hearing. They alleged, in essence, that the operator had violated section 21166, subdivision (a), by failing to prepare a supplemental EIR addressing the substantial changes to the project.

The fairgrounds operator demurred on grounds the suit was barred by the 180-day limitations period of section 21167, subdivision (a), because it was commenced more than 180 days after work on building the theater began— the latest "constructive notice" date set forth in that section. The plaintiffs responded that they had no actual or constructive notice of the unannounced

changes in the theater design until the first concert made them apparent. The trial court sustained the demurrer and dismissed the action. The Court of Appeal affirmed, but this court reversed.

Acknowledging the literal provisions of the limitations statute, we nonetheless held that, under the facts before us, CEQA's goal of public participation could be satisfied only if the beginning of the 180-day limitations period was postponed until the public had a chance to learn of substantial project changes *neither announced by the agency nor necessarily apparent by virtue of the commencement of construction.* Under such circumstances, we held, the 180-day period must be deemed to start when the public had actual or constructive notice that the theater actually built was substantially different from the one evaluated in the project EIR. Thus, we concluded, the plaintiffs in the case at issue should have had an opportunity to prove they did not know, and could not have learned, of the theater's alterations until within 180 days before they filed their suit.

Fortuitously, in *Concerned Citizens of Costa Mesa,* the claims of substantial changes to a previously approved project bore on both the merits of the action and the period within which suit could be brought. On the merits, these claims were part of a cause of action alleging that the agency had violated CEQA by authorizing environmentally significant changes in a project without preparing a new EIR. For limitations purposes, the assertions bore on the separate and distinct issue of when the plaintiffs had actual or constructive notice sufficient to charge them with diligence in bringing their suit. Nothing in that case suggested, as a general principle, that flaws in a project approval process should delay the limitations period normally applicable when, as in the instant case, *the agency gave notice of the very approval the plaintiffs seek to challenge.* We find no basis for such a holding here.

Plaintiffs and their amicus curiae make the novel argument that, insofar as the Director's authorization of the Wal-Mart project *was* a "ministerial" action exempt from CEQA, as the NOE filed on February 17, 2004, asserts, it could only be such because it did not change the prior approved project represented by the MDP. Thus, plaintiffs insist, there was no project change or new project "approval," and the NOE thus could not trigger a new statute of limitations.

At the outset, it is difficult to see how such a theory aids plaintiffs. The limitations period for challenging the Spanos Park West SEIR, under which the MDP was approved, had long since expired when they brought their lawsuit. Thus, if no new limitations period was triggered, as plaintiffs suggest, they fail to explain how their suit is timely.

In any event, the contention lacks merit. Under CEQA, a project is any activity undertaken, assisted, or authorized by a public agency that may have a significant effect on the environment. (§ 21065; CEQA Guidelines, § 15378, subd. (a).) Such an activity may include any one of a series of individual environment-changing steps contemplated by a staged, master, or program EIR, such as the Spanos Park West SEIR. (See CEQA Guidelines, §§ 15167–15179.) As noted above, an approval is any action that commits the agency to a definite course of action on a project. That an environmentally significant activity may conform to a previously certified general development plan, or staged, master, or program EIR, does not mean the activity need not be individually approved. It simply means that the approval may not require new environmental study. (See § 21166.)

The proposed construction of a Wal-Mart Supercenter on undeveloped urban land clearly was an activity with potential environmental effects. Moreover, under both the MDP (see MDP, § 8.2) and City ordinance (see Stockton Planning & Zoning Code, § 16-208.F), each specific proposal for development within Spanos Park West was subject to a site plan review and approval for consistency with the standards and requirements of the MDP. The Wal-Mart proposal was subject to these rules, and thus was itself a project.

However, some activities are exempt from CEQA, even though they have environmental significance, require agency approvals, and are thus projects. Under section 21080(b)(1) these include "[m]inisterial projects proposed to be carried out or approved by public agencies." A "ministerial" decision is one that involves little or no judgment or discretion by the approving official about the wisdom or manner of carrying out the project (CEQA Guidelines, §§ 15357, 15369), but this does not mean such a decision is not a project approval. When a local agency has undertaken to approve a project under the ministerial exemption, section 21152(b) allows the agency to file an NOE announcing this determination. Under section 21167(d), the NOE filing triggers a 35-day limitations period to challenge the exemption determination.

In authorizing the Wal-Mart project, City took the position that the project conformed to the previously approved MDP, that the Director was therefore permitted and required to approve it (MDP, § 8.2; Stockton Planning & Zoning Code, § 16-208.F), and that the approval was thus a ministerial action exempt from CEQA. City, through the Director, filed an NOE to that effect. Accordingly, as section 21167(d) provides, the NOE triggered a 35-day limitations period for the challenge at issue here—i.e., that the Wal-Mart project approval (1) was *not* within the scope of the previously approved

MDP and Spanos Park West SEIR, (2) therefore was *not* exempt from CEQA as a mere ministerial decision, and (3) thus required a new, project-specific environmental assessment.

Finally, plaintiffs insist the NOE itself was defective in form and substance, and thus void. (See, e.g., *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 532 [78 Cal.Rptr.3d 1]; *International Longshoremen's & Warehousemen's Union v. Board of Supervisors* (1981) 116 Cal.App.3d 265, 272–273 [171 Cal.Rptr. 875].) They claim that, contrary to CEQA's requirements, the NOE failed to describe the project, omitted material information, and included materially false information. We find the contention unpersuasive.

An NOE must contain (1) a brief description of the project, (2) its location (by street address or cross street in urbanized areas, or by attaching a site map), (3) a finding that the project is exempt from CEQA, including a citation to the statute or CEQA Guideline on which the agency is relying, and (4) a brief statement of reasons to support the finding of exemption. (CEQA Guidelines, § 15062, subd. (a).) The NOE filed by City on February 17, 2004, gave the location of the project as the "Northwest corner of Trinity Parkway and Cosumnes Drive, City of Stockton, San Joaquin County," further identifying it as "Assessor's Parcel Number: APN: 071-600-030." It stated that the project was located on approximately 22.38 acres within the Spanos Park development, "a fully entitled master planned development governed by a Master Development Plan . . . adopted . . . on January 2, 2002," and described the project as "a retail use consistent with the Development Plan," to be built in two sequential phases, of approximately 138,722 and 68,888 square feet respectively. Announcing City's finding of a CEQA exemption, the NOE declared that the Director, "as directed and authorized under the Spanos Park West Master Development Plan (MDP1-00) has determined that the Site Plan, Grading Plan, Landscape Plan, Building Elevations and Design applicable to the Project conform to the standards set forth in the Spanos Park West Master Development Plan, which determination is a ministerial action not subject to CEQA review under Public Resources Code Section 21080(b)(1) and CEQA Guidelines Section 15369."

Plaintiffs urge that the NOE's project description was misleading, because it stated the project was "located in a Mixed-Use ('MX') Zoning District and the property's primary land use designation is commercial according to the Development Plan's Conceptual Site Plan." This description, plaintiffs urge, misstated the actual primary use contemplated by the MDP for the specific site of the proposed Wal-Mart store, which was high-density residential. Thus, in plaintiffs' view, "[a]nyone reading the Project description would have no clue the Project was a big-box retail store, which would replace 637

units of high-density housing." Further, plaintiffs urge, the NOE failed to describe the "whole" project (see CEQA Guidelines, § 15378, subd. (a)) because it neglected to mention that the siting of the proposed store on parcels 17 and 17a would require amendment of the Density Agreement.

However, the project description portrayed the project as a "retail use" which, when completely built out, would exceed 207,000 square feet. The NOE thus clearly identified the project as a very large retail store, and was not required to do more in this regard. Nothing in CEQA or its CEQA Guidelines indicates, for example, that the NOE was defective because it failed to name the store as a Wal-Mart. (See *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 441–442 [15 Cal.Rptr.3d 322] ["brief description" of project in required notice of preparation of EIR (§ 21092, subd. (b)(1)) was not defective for failure to identify Wal-Mart as end user of proposed distribution center].)

 Moreover, an NOE need only provide a "brief" description of the approved project, state its location, and set forth reasons for the agency's finding of exemption. (CEQA Guidelines, § 15062, subd. (a).) Once the agency files a notice satisfying these basic requirements, thus alerting the public to the agency's decision and its basis, it is the public's obligation thereafter to determine whether a challenge to the project approval is appropriate. The CEQA Guidelines do not demand that the NOE itself disclose and explain all the arguable environmental implications, or all the grounds upon which such a challenge to the exemption determination might be based. Thus here, we are persuaded, it was not necessary for the NOE to state that the Wal-Mart project might displace future residential development or require amendment of the Density Agreement. These were matters that interested members of the public, once notified of the decision, were obliged to investigate for themselves.[15]

---

[15] Plaintiffs rely heavily on *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136 [249 Cal.Rptr. 439], but, to the extent that case is persuasive on its facts, we find it inapposite here. In *McQueen*, an open space district approved the purchase of surplus federal property that had previously been used as a military communications station. The Air Force had notified the district that the property contained toxic wastes, including transformers filled with polychlorinated biphenyls (PCB). After approving the acquisition, the district filed an NOE, relying on several "categorical exemptions"—classes of projects the state Secretary for Resources has found *not to have a significant effect on the environment*. (§ 21084, subd. (a); CEQA Guidelines, § 15300.) The categories cited were transfers of interests in land in order to preserve open space (CEQA Guidelines, § 15325), acquisition of parklands in natural condition or containing historical or archeological sites (*id.*, § 15316), and sales of surplus government property (*id.*, § 15312). The Court of Appeal held, among other things, that persons seeking to litigate the exemption determination were excused from exhausting their administrative remedies because neither the public hearings on the acquisition nor the NOE had given fair notice of the toxic waste issue. (See § 21177, subd. (e).) Indeed, by relying on categorical exemptions that implied the *complete absence* of adverse environmental effects, and by omitting mention of the serious

Nor, contrary to plaintiffs' contention, did the NOE state a material falsehood by declaring that "*the property's* primary land use designation is *commercial.*" (Italics added.) Plaintiffs point out that the "primary" land use identified by the MDP for parcels 17 and 17a, part of the proposed store site, is multifamily residential. But, read in context, the quoted sentence appears to refer to the Spanos Park West development *as a whole*, not to the specific 22.38 acres within the development on which the Wal-Mart store would be built.

Interpreted in this way, the sentence is not materially misleading. Of the 26 parcels of Spanos Park West, comprising some 158.11 acres, contemplated for development in the MDP, 114.55 were described as primarily intended for business and retail uses, while only 43.56 were designated as primarily slated for high-density residential. (See MDP, table 3-1, Land Use Summary.) Moreover, the MDP stresses that, "[b]ecause of the inherent flexibility of the M-X zoning designation," the conceptual site plan sets forth "a possible *pattern* of uses that respond to market conditions and the developer's expectations at a specific point in time," but "also represents a *range* of land use options that comply with the criteria established by the M-X Zone." (MDP, § 3.3.1, italics added.) Optional uses for parcels 17a and adjacent parcels 18 and 19 included 225,000 square feet of retail space. (MDP, table 3-1, Land Use Summary.) Under these circumstances, no material falsehood appears.

We do not suggest the NOE in this case could not have been clearer and more informative. Nor do we condone purposeful obfuscation in an NOE. We conclude only that the NOE in this case minimally complied with CEQA, and thus was effective to trigger the 35-day limitations period of section 21167(d).[16]

---

problem that actually existed, the NOE left the impression that this was an environmentally *beneficial* purchase of open space with *no basis whatever* for an environmental challenge. Such is not the case here. The NOE for the Wal-Mart project did not rely on a categorical exemption for projects of a class already determined to lack environmental significance. Moreover, it disclosed an activity—the construction of a large retail store on undeveloped urban land—with obvious and inherent environmental impacts, and it referenced the MDP to which the project allegedly conformed, and under which City claimed it had taken an exempt ministerial action. The NOE was not thereafter obliged to explain the complete legal and environmental context of the project. Such an interpretation of the phrase "description of the project," as used to set forth the requirements of an NOE, would overlook the qualifying adjective "brief." (CEQA Guidelines, § 15062, subd. (a).)

[16] Appellants argued below that the suit was also barred by the limitations period set forth in Government Code section 65009, subdivision (c) (establishing a 90-day statute of limitations for challenging certain land use decisions by local agencies). Neither the trial court nor the Court of Appeal ruled on this issue, and we express no opinion upon it.

Accordingly, the judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.