Filed 8/10/16 Unmodified opinion attached

CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., | B245131 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS131347) |
| v. | |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE, | ORDER MODIFYING OPINION AND  DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant; | |
| THE NEWHALL LAND AND FARMING COMPANY, | |
| Real Party in Interest and Appellant. | |

The unpublished portion of the opinion filed on July 11, 2016 is modified as follows:

On page 12, the second full sentence, beginning with "In her letter," delete "her" and replace with "his" and delete "she" and replace with "he."

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion was certified for publication with the exception of parts II, III and IV.

There is no change in the judgment.The rehearing petition is denied.

_____   _____   _____
TURNER, P.J.              KRIEGLER, J.              BAKER, J.

Filed 7/11/16  Unmodified opinion

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>DEPARTMENT OF FISH AND WILDLIFE,<br><br>    Defendant and Appellant;<br><br>THE NEWHALL LAND AND FARMING COMPANY,<br><br>    Real Party in Interest and Appellant. | B245131<br><br>(Super. Ct. No. BS131347) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Reversed with directions in part; affirmed in part.

Office of the General Counsel, Thomas R. Gibson, General Counsel, Wendy L. Bogdan, General Counsel and John H. Mattox, Senior Staff Counsel; Thomas Law Group, Tina A. Thomas, Ashle T. Crocker and Amy R. Higuera, for Defendant and Appellant California Department of Fish and Game.

Gatze Dillon & Balance, Mark J. Dillon and David P. Hubbard; Morrison & Foerster and Miriam A. Vogel; Nielsen Merksamer Parinello Gross & Leoni and Arthur

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II, III and IV.

G. Scotland; and Downey Brand and Patrick G. Mitchell, for Real Party in Interest and Appellant The Newhall Land and Farming Company.

John Buse and Adam Keats; Chatten-Brown and Carstens, Jan Chatten-Brown and Doug Carstens, for Plaintiffs and Respondents Center for Biological Diversity, Friends of the Sara Clara River, Santa Clarita Organization for Planning and the Environment, and California Native Plant Society.

Jason Weiner; Chatten-Brown and Carstens, Jan Chatten-Brown and Doug Carstens, for Plaintiffs and Respondents Wishtoyo Foundation/Ventura Coastkeeper.

## I. INTRODUCTION

Defendant, California Department of Fish and Wildlife (the department), and real party in interest, The Newhall Land and Farming Company (the developer), appeal from a judgment granting a mandate petition. The judgment, entered October 15, 2012, was granted in favor of plaintiffs: Center for Biological Diversity; Friends of the Santa Clara River; Santa Clarita Organization for Planning the Environment; Wishtoyo Foundation/Ventura Coastkeeper; and California Native Plant Society. The litigation and appeal arise from the department's December 3, 2010: certification of the revised final environmental impact statement and impact report; approval of the Newhall Ranch Resource Management and Development Plan (resource management and development plan); the adoption of the Spineflower Conservation Plan and Master Streambed Alteration Agreement (streambed alteration agreement); and issuance of two incidental take permits. We issued an opinion reversing the October 15, 2012 judgment. (*Center for Biological Diversity v. Department of Fish and Wildlife* (2014) 224 Cal.App.4th 1105, review granted July 9, 2014, No. S217763.) Our Supreme Court granted review and, after issuing an opinion, remanded the case to us. (*Center for Biological Diversity v. Department of Fish and Wildlife* (2015) 62 Cal.4th 204, 241 (*Center for Biological Diversity*).)

In the published portion of this opinion, we will discuss the developer's contention, concurred in by the department, that we should supervise compliance with a writ of mandate. As will be noted, the developer and the department argue we should in essence issue our own writ of mandate and then supervise compliance with our orders.

3

This contention is based upon language appearing in Public Resources Code[1] section 21186.9, subdivision (a) and our Supreme Court's opinion. As will noted, we conclude we do not have that authority since we are reviewing this case on direct appeal. Our disposition is to reverse the judgment in part and affirm it in part.

[Parts II, III and IV are deleted from publication. See *post* at page 25 where publication is to resume.]

## II. GREENHOUSE GAS EMISSIONS

Our Supreme Court reached three conclusions concerning the greenhouse gas omission analysis in the environment impact report. In the introduction to the opinion, our Supreme Court identified two of the three greenhouse gas emissions issues it was deciding: "We conclude, first, that as to greenhouse gas emissions the environmental impact report employs a legally permissible criterion of significance—whether the project was consistent with meeting statewide emission reduction goals—but the report's finding that the project's emissions would not be significant under that criterion is not supported by a reasoned explanation based on substantial evidence." (*Center for Biological Diversity, supra*, 62 Cal.4th at p. 213.) At issue is the requirement that an environmental impact report classify adverse ecological effects as significant or less than

---

[1] Future statutory references, unless otherwise stated, are to the Public Resources Code. Future references to Guidelines are to the regulatory provisions located in California Code of Regulations, title 14, section 15000 et seq. The Guidelines are promulgated by the California Natural Resources Agency to implement the California Environmental Quality Act. (§ 21083, subd. (e); *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448, fn. 4.)

4

significant.  (§ 21100, subd. (b)(1); Guidelines, § 15064, subd. (b); 2 Kostka & Zischke, Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2014) § 13.8, p. 13-10 (Kostka & Zischke).)

First, our Supreme Court concluded that the selection of the Health and Safety Code section 38850 greenhouse gas omissions reduction goals as a significance criterion was not an abuse of discretion.  (*Center for Biological Diversity, supra*, 62 Cal.4th at pp. 222-223.)  Nor did our Supreme Court conclude that use of the Health and Safety Code section 38850 goals as a significance criterion violated Guidelines section 15064.4, subdivisions (b)(1) or (b)(2).  The trial court, by contrast, ruled that the use of the Health and Safety Code section 38850 greenhouse gas omissions reduction goals was inappropriate.  In light of our Supreme Court's approval of the Health and Safety Code section 38850 greenhouse gas omissions reduction goals, this portion of the trial court's judgment must be reversed.

Second, our Supreme Court further concluded that comparing the project's expected emissions to a hypothetical business-as-usual scenario was appropriate.  (*Center for Biological Diversity*, *supra*, at 62 Cal.4th pp. 224-225.)  The trial court ruled a baseline assessment is the sole criterion that may be utilized in conducting greenhouse gas omissions analysis in an environmental impact report under our circumstances.  The trial court ruled:  "In cases in which a project is being proposed for undeveloped pieces of property (such as in this case), the baseline has been existing environments, rather than some hypothetical impacted future environment that might occur without the project.  [Citations.]  [¶]  A baseline analysis of impacts on the existing environment, therefore, is

5

required to inform decision-makers of the magnitude (or significance) of the cumulative environmental impact Newhall Ranch Project on greenhouse gas omissions.  Whether such a project would assist or defeat (or, more likely, have no effect on) the state's efforts at reducing these levels is not the proper question."

By contrast, our Supreme Court ruled differently:  "The percentage reduction from business as usual identified by the Scoping Plan is a measure of the reduction effort needed to meet the 2020 goal, not an attempt to describe the existing level of greenhouse gas emissions.  Similarly, the [environmental impact report] employs its calculation of project reductions from business-as-usual emissions in an attempt to show the project incorporates efficiency and conservation measures sufficient to make it consistent with achievement of [the Health and Safety Code section 38850 ] reduction goal, not to show the project will not increase greenhouse gas emissions over those in the existing environment.  As discussed earlier, distinctive aspects of the greenhouse gas problem make consistency with statewide reduction goals a permissible significance criterion for such emissions.  Using a hypothetical scenario as a method of evaluating the proposed project's efficiency and conservation measures does not violate Guidelines section 15125 or contravene our decision in *Communities For A Better Environment* [*v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310].)"  (*Center for Biological Diversity, supra*, 62 Cal.4th at p. 225.)  The trial court's ruling is inconsistent with our Supreme Court's baseline calculation analysis.  Thus, that portion of the trial court's ruling as reflected in the final statement of decision must be reversed.

Third, our Supreme Court held that the environmental impact report's finding of no significant ecological impact under that criterion was not supported by substantial evidence. Our Supreme Court articulated its analysis on several occasions. For purposes of completeness, we identify the core analysis of our Supreme Court: "[W]e agree with plaintiffs that [the department] abused its discretion in finding, on the basis of the [environmental impact report's] business-as-usual comparison, that the project's greenhouse gas emissions would have no cumulatively significant impact on the environment. We reach this conclusion because the administrative record discloses no substantial evidence that Newhall Ranch's *project-level* reduction of 31 percent in comparison to business as usual is consistent with achieving [Health and Safety Code section 38850]'s *statewide* goal of a 29 percent reduction from business as usual, a lacuna both dissenting opinions fail to address. Even using the [environmental impact report]'s own significance criterion, the [environmental impact report]'s analysis fails to support its conclusion of no significant impact." (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 225.)

At another point, our Supreme Court summarized the scope of its holding: "At bottom, the [environmental impact report]'s deficiency stems from taking a quantitative comparison method developed by the Scoping Plan as a measure of the greenhouse gas emissions reduction effort required by the state as a whole, and attempting to use that method, without consideration of any changes or adjustments, for a purpose very different from its original design: To measure the efficiency and conservation measures incorporated in a specific land use development proposed for a specific location. The

7

[environmental impact report] simply assumes that the level of effort required in one context, a 29 percent reduction from business as usual statewide, will suffice in the other, a specific land use development. From the information in the administrative record, we cannot say that conclusion is wrong, but neither can we discern the contours of a logical argument that it is right. The analytical gap left by the [environmental impact report]'s failure to establish, through substantial evidence and reasoned explanation, a quantitative equivalence between the Scoping Plan's statewide comparison and the [environmental impact report]'s own project-level comparison deprived the [environmental impact report] of its "'sufficiency as an informative document.'" (*Laurel Heights Improvement Assn v. Regents of University of California*[ (1988) 47 Cal.3d 376,] 392.)" (*Center for Biological Diversity, supra*, 62 Cal.4th at p. 227.) In its conclusion, our Supreme Court summarized its holding, "We conclude . . . that [the department] abused its discretion by making the determination, without the support of substantial evidence, that the project's greenhouse gas emissions would have no significant impact. . . ." (*Id.* at p. 240.)

In terms of our disposition, the trial court's ruling is reversed on two counts. First, the trial court's ruling that the selection of the Health and Safety Code section 38850 reductions as a significance criterion was an abuse of discretion is reversed. Second, that portion of the trial court's ruling concluding that comparing the project's expected emissions to a hypothetical business-as-usual scenario is impermissible is reversed. But the judgment is affirmed as to the trial court's ruling there is no substantial evidence the project's greenhouse gas emissions will not result in a cumulatively significant environmental impact. Once the remittitur issues, the trial court is to issue a writ of

8

mandate. The writ of mandate is to state that the department's finding the project's greenhouse gas emissions will have no significant impact is not supported by substantial evidence and reasoned discussion.

## III. MITIGATION MEASURES FOR PROTECTING THE UNARMORED THREESPINE STICKLEBACK

Our Supreme Court held that mitigation measures BIO-44 and BIO-46 violate the Fish and Game Code section 5515 prohibition against the taking of the unarmored threespine stickleback. Upon remittitur issuance, a writ of mandate is to issue setting aside the department's approval of BIO-44 and BIO-46. (*Center for Biological Diversity, supra*, 62 Cal.4th at pp. 231-237.)

## IV. NATIVE AMERICAN CULTURAL RESOURCES AND STEELHEAD SMOLT ISSUES

### A. Supreme Court Remand Order

Our Supreme Court remanded the case to us to determine whether to reconsider two issues concerning Native American cultural resources and the effect of dissolved copper on steelhead smolt. The reason for our Supreme Court's remand order as to these two issues is as follows. This case involved the filing of a joint environmental impact statement/environmental impact report by defendant and the United States Army Corps of Engineers (the engineering corps). (*Center for Biological Diversity, supra*, 62 Cal.4th at pp. 213-214, 237-238.) The National Environmental Protection Act permits public comment after certification of an environmental impact statement. (*Id.* at p. 237-238; 40 C.F.R. §§ 1503.1(b), 1506.10(b)(2).) Here, the department responded to comments

9

received after preparation of the environmental impact report while jointly engaging in environmental review with the engineering corps. (*Center for Biological Diversity, supra*, 62 Cal.4th at pp. 214, 237-238.) We held that the plaintiff's comments were untimely. Our Supreme Court held that, under the facts of this case, the comments were timely. (*Center for Biological Diversity, supra*, 62 Cal.4th at pp. 238-239.)

However, that did not end the issue before our Supreme Court. The department and the developer argued that since we found substantial evidence supported the environmental impact report's conclusions, our judgment should be affirmed. By contrast, plaintiffs argued that the entire issue should be revisited on the merits. Our Supreme Court ruled that we should decide whether a merits reexamination was warranted. (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 239.) We have reexamined the merits of the issues concerning Native American cultural resources and the effect of dissolved copper on steelhead smolt. We, with respect, conclude that substantial evidence supports the department's conclusions and plaintiff's assertions are all premised on a misapplication of the standard of review.

## B. Native American Cultural Resources

The first issue remanded to us involves the environmental impact report's discussion of Native American cultural resources. The trial court disapproved the environmental impact report's Native American cultural resources discussion. Plaintiffs argued that the environmental impact report failed to adequately disclose evaluate or mitigate the projects impacts on Native American cultural resources. In our prior

10

opinion, we held that no grounds existed to set aside the environmental impact report's certification.

We conclude the following. As noted, our Supreme Court explained that there are two letters which were timely filed. The first is a August 2, 2010 letter from Chumash Ceremonial Elder Mati Waiya which contains an extensive attachment. Elder Waiya argues: there are many remnants of Chumash tribal culture present in the "[p]roject area"; the project's footprint would be devastating to Chumash tribal burial, sacred and ceremonial sites and cultural resources such as the California condor; there were other burial sites other than those identified in the environmental impact report; [s]ufficient and reasonably diligent field surveys are necessary to identify the impacts on Native American cultural and historic resources"; the W&S Consultants' report was fatally flawed in that it erroneously stated the Tataviam Tribe was extinct; reliance on the W&S Consultants' report was thus "concerning"; and the project will drive away and kill the California condor which is part of Chumash tribal religious and cultural and spirituality. Elder Waiya concludes in part: "When I look at the river, I recall the years of going up and down the river with my uncle, cousin, and mother. It is one of the last wild rivers and holds deer, coyote, various natural and cultural resources, and our ancestors. It is hard to imagine destroying the [p]roject area with concrete, buildings, noise, lights and trash pollution. Not only does this disturb the whole natural system, but also disturbs the spirits of our ancestors." Attached to Elder Waiya's letter is a 392 page document entitled, "Ethonographic Overview of the Los Padres National Forest." Prepared by Northwest Economic Associates for the United States Department of Agriculture, it

11

contains a 79-page study of Chumash and Tataviam tribal life and settlements. Elder Waiya's letter only directly makes reference to page 219 of the Northwest Economic Associates study. In her letter, Elder Waiya identifies a map which she argues shows the Tataviam village was located in the project area.

The department responded to Elder Waiya's comments. The department's responses to Elder Waiya's comments warrant full explication and are as follows: accepted standards of practice were utilized in conducting archival and intensive pedestrian surveys; the environmental impact report identified the past presence of the Tataviam Tribe within the project site; despite intensive surveys and test excavations, there was no evidence that "hundreds upon hundreds" of Tataviam tribal sites were located in the project area; mitigation measures provided for the presence of an archaeologist if construction occurs within 300 feet of any known archaeological sites; a mitigation measure imposes a 50-foot buffer around any known archaeological site in the case of any earth disturbance; and another mitigation measure requires specified actions be taken if any Native American cultural resources are encountered during grading. In addition, the department notes that an August 2007 agreement had been entered into with the Fernando Tataviam Band of Mission Indians which provided funding for use in the development of Tataviam cultural enrichment programs; constructing a Tataviam interpretive cultural center; and educating the surrounding non-native community. Moreover, in the event of the discovery of human remains, a specified protocol must be followed consisting of: notification of the Los Angeles County Corner; if the remains are Native American, the Native American Heritage Commission is to be notified; that

12

commission is to identify a person who is the most likely descendent from the deceased Native American's tribe; other specified steps are to be followed in compliance with section 5097.98 as appropriate; and reburial is to occur along with associated grave goods in an area not subject to further subsurface disturbance.

In terms of the project's impacts on the California condor, the department responded to Elder Waiya's comments: "no designated critical habitat" for the species exists in the project site; this is because there is little suitable foraging and nesting habitat in the project area; this is because there is a lack of abundant prey in the project area; no harvesting of condor feathers occurs within the project area because it is closed to the public; and extensive archival data indicates that the condor never figured prominently in Chumash tribal culture. In addition, the department's comments reiterate the analysis in the environmental impact report which indicates: in the 25 years preceding 2008, no condor was never observed in the project area; between 2008 and 2009, condors did land in the project area on several occasions; due to the lack of prey and limited foraging opportunities with the project area, construction activities would have no adverse impact on the condor; suitable foraging habitat is present in the High Country Special Management and Salt Creek Areas which would not be affected by the buildout within the specific plan's confines; and risks to individual condor were rated as highly unlikely because the species rarely enters the project area. The environmental impact report concluded that, *absent mitigation*, short- and long-term secondary impacts, which include potential mortality from interaction with human conduct would be significant.

13

In addition, the department's lengthy responses to Elder Waiya's comments discussed the mitigation measures designed to protect the condor. The mitigation measures include: the presence of a qualified biologist during construction with the authority to stop any work; notification of the department in the case of condor sightings; training of construction workers concerning the avoidance of micro-trash which could have a potentially fatal impact on condors; and the removal of dead cattle to the High Country Special Management and Salt Creek Areas thereby reducing the risk of injury to condors. Other mitigation measures insured the presence of foraging habitat in the specific plan area: management of the habitat in the Salt Creek Area; limitations on utilities, which can cause injuries or death to the condor in the Salt Creek Area; the preservation of 1,900 acres of coastal scrub within the project site as well as in the specific plan area; and imposing requirements for restoration of coastal sage scrub in the event of invasive species, fire, erosion, drought or unforeseen events. And the mitigation measures included preconstruction meetings with a qualified biologist to discuss procedures for minimizing harm to or harassment of wildlife. Finally, the mitigation measures require: homeowner association educational materials concerning pets and the requirement they be kept on leashes; specified limitations on the construction of utility poles and cell and phone towers so as to reduce collisions with condors and other birds; and the installation of anti-perching devices to deter condors and other raptors from perching on antennae and phone and utility towers. As a result, the environmental impact report concluded that the long-term secondary impacts to the California Condor would be adverse but not significant.

14

Finally, the department responded to Elder Waiya's comments about how the project would destroy the cultural landscape of the Chumash Tribe. As noted in our original opinion, W&S Consultants conducted an extensive physical examination of the entire project site. That review of the project site failed to uncover any evidence of Chumash Tribe artifacts. Further, the Tataviam Tribe whose territory historically encompassed the project site, expressed support for the proposed construction. As to both the California condor and historic site arguments presented by Elder Waiya, none of them directly addressed any issues relating to the mitigation measures.

The second letter, authored by Jason Weiner of the Wishtoyo Foundation dated August 3, 2010, reiterates many of the same concerns as those expressed by Elder Waiya. Mr. Weiner's analysis challenges the following aspects of the environmental impact report: it fails to recognize the historic presence of Chumash Tribe in the project area; the procedure for preserving unanticipated discovery of human remains is not in compliance with relevant statutory and regulatory provisions; there had been a failure to consult with trustee agencies regarding as required by Guidelines section 15086, subdivision (a)(2); the mitigation measures in connection with cultural resources are inadequate; and there was a failure to identify and analyze impacts in connection with historic sacred sites that depend on the condor's presence. As did Elder Waiya, Mr. Weiner also references the Northwest Economic Associates prepared for the federal agriculture department.

The department prepared a 14-page single spaced response to Mr. Weiner's letter. Much of our analysis concerning Elder Waiya's comments apply equally here. The W&S

15

Consultants' study, which encompassed both archival research and archeologists walking the entirety of the project, constitutes substantial evidence supporting the department's cultural resources conclusions. The W&S Consultants' study uncovered no evidence of the Chumash Tribe's presence in the project site. Further, the W&S Consultants' study located eight prehistoric sites in the specific plan area. And, the specific plan imposes mitigation measures SP-4.3-1 through SP-4.3-3 and SP-5.0-21 in the case of any discoveries of prehistoric and historic archaeological sites and remains. The environmental impact report engages in a lengthy analysis of direct and indirect impacts on Native American cultural resources under various development scenarios. Moreover, the environmental impact report imposes mitigation measures CR-1a through CR-6 which require: the protection of the two sites labeled CA-LAN-2133 and CA-LAN-2233 from development and vandalism; in the event that either of these sites cannot be avoided, the data recovery mitigation program must be instituted after consultation with the Tataviam tribal community; strict limitations on earth disturbance within 300 feet of any known archaeological site; and a specified procedure to be followed in the event of the discovery of cultural resources during grading in the project area. Finally, mitigation measure CR-6 identifies procedures to be followed when any human remains are discovered except on a dedicated cemetery.

Additionally, the department's comments explain there has been full compliance with Guidelines section 15064.5, subdivision (d) concerning consultation with other agencies. The department's comments also identify and attach letters sent to persons representing the interests of the various Native American tribes and documented

16

telephone conversations.  Also attached to the department's comments are copies of letters sent by the engineering corps to individuals representing Native American interests or other government organizations.

The department's responses to the Native American cultural resources comments fully comply with California's statutory or regulatory and decisional requirements. A lead agencies written responses must describe the disposition of each significant environmental issue raised in the public comments.  (§ 21091, subd. (d)(2)(B); Guidelines, § 15088, subd. (c).)  The lead agency's responses must consist of a good faith reasoned analysis.  (*Santa Clarita Organization for Planning the Environment v. County of Los* Angeles (2003) 106 Cal.App.4th 715, 723; *Cleary v. County of Stanislaus* (1981) 118 Cal.App.3d 348, 357.)  It is insufficient for a lead agency to merely provide conclusory statements which are unsupported by factual information.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124; *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 191.)  The lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects.  (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 6 Cal.4th at p. 1124; *Stanislaus Natural Heritage Project*, *supra*, 48 Cal.App.4th at p. 191.)  The lead agency need not respond to every public comment, but it must explicitly respond to the most significant environmental questions raised in opposition to the project.  (*Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 862; *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal. App. 3d 604, 628.)  As can be noted,

17

the department's responses to the comments fully comply with the requirements imposed by section 21091, subdivision (d)(2)(B) and Guidelines, section 15088, subdivision (c).

In terms of the ultimate merits of whether the department's certification determination was correct, we stand by our prior opinion. In terms of the correctness of a lead agency's environmental conclusions, our Supreme Court has explained: "Thus, the reviewing court '"does not pass upon the correctness of the [environmental impact report's] environmental conclusions, but only upon its sufficiency as an informative document."' [Citations.] We may not set aside an agency's approval of an [environmental impact report] on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564, quoting *Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 392 and *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189.) Thus, we defer to the department's resolution of conflicting opinions and evidence. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1042.) Our standard of review is the same as that of the trial court. We do not review the trial court's decision; rather, we examine the department's adherence to the law and environmental conclusions. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427; *Melom v. City of Madera* (2010) 183 Cal.App.4th 41, 47-48.) Every contention posited by plaintiffs contravenes the foregoing standard of review for a lead agency's environmental conclusions.

18

As we explained in detail in our original opinion, substantial evidence supports the department's findings concerning Native American cultural resources. As we explained in our prior opinion: the environmental impact report's conclusions are based upon scholarly archival analysis and the Phase I and II surveys conducted by W&S Consultants; the W&S Consultants staff included credentialed academics; the discussion in the project and specific plan environmental impact reports is exhaustive; as to the burial locations discovered during the W&S Consultants' surveys, the sites denominated CA-LAN-2133 and CA-LAN-2233 are protected by explicit mitigation measures; and in the unlikely event Native American resources were uncovered, the project and specific plan environmental impact reports' mitigation measures impose extensive protection for those resources. There is no merit to plaintiffs' arguments concerning the extent of the mitigation plan. As we explained in our original opinion: the extensive pedestrian survey revealed virtually no Native American cultural resources in the specific plan and therefore the project area; the use of preservation in place practices, as is discussed at the length in the environmental impact report, is the preferred technique for mitigating archaeological impacts (Guidelines, § 15126.4, sub. (b)(3)); specific limitations are imposed on construction near the two known burial sites; and if it is infeasible to avoid construction on a burial site or location where cultural resources are discovered, specific contingencies are to be implemented. We summarized those wide-ranging contingencies in our original opinion: Phase III data collection operations are to be completed which is in essence a salvage venture; if additional artifacts are uncovered, an archaeologist is to be notified; the archaeologist is to stabilize and evaluate the discovery; and any Phase III

19

salvage operation must be conducted in consultation with Tataviam community, the tribe that historically inhabited the project area. If possible, the newly discovered site is to be protected by specified protective measures. Finally, the discovery of human remains must be handled in compliance with section 5097.98 and Guidelines section 15064.5 subdivision (e). Thus, as we held in our original opinion, the trial court's rulings concerning Native American cultural resources are reversed.

C. Impacts on Steelhead Smolt

The second issue remanded to us concerns the impact of dissolved copper runoff from the project site on steelhead smolt. Our Supreme Court, as in the case of the Native American cultural resources issues, left to us the question of whether are merits based determinations warranted reexamination. (*Center for Biological Diversity, supra,* 62 Cal.4th at p. 239.) Upon, reexamination we reach the same ultimate conclusions as we did in our initial opinion. And it bears emphasis that the environmental impact report concludes there is no significant ecological impact *after* the implementation of the mitigation measures.

Before discussing the effect of dissolved copper runoff on steelhead smolt, it is wise to describe the so-called "dry gap." A material part of the scientific analysis supporting the environmental impact report and the discussion therein concerning dissolved copper runoff in the Santa Clara River involves the dry gap. The dry gap is described in the April 2008 report of GSI Water Solutions, Inc. which assesses future surface water conditions in that part of the Santa Clara River. The dry gap is defined by the GSI Water Solutions, Inc. staff as follows: "Beginning about 3.5 river miles

20

downstream of the county line, the [Santa Clara] [R]iver is dry most of the year, with water present only when rainfall events creates sufficient stormwater runoff into the [Santa Clara] [R]iver. This dry ephemeral reach of the [Santa Clara] [R]iver extends beyond the mouth of Piru Creek as informally known as the 'dry gap' in the Santa Clara River." (As will be noted, the dry gap discussion is but part of the scientific analysis pertinent to whether the project will have a significant environmental impact.)

Two paragraphs in plaintiffs' mandate petition contain direct allegations concerning steelhead smolt. Plaintiffs allege the environmental impact report fails to analyze and mitigate water quality impacts below the "dry gap" in the Santa Clara River and coastal marine waters. At another point, the mandate petition alleges: "The [environmental impact report] fails to identify the [p]roject's significant water quality impacts to southern steelhead smolt residing in the Santa Clara River estuary, migrating adult steelhead in the Santa Clara River, or migrating steelhead smolt in the Santa Clara River, nor does it provide measures to mitigate those impacts to a less than significant effect." Plaintiffs argued in their papers filed in the trial court, "The [environmental impact report] fails to analyze the sub- lethal . . . impacts of the [project's] discharges of dissolved copper on juvenile steelhead." The trial court ruled that the environmental impact report failed to adequately discuss the impact of dissolved copper discharged from the project area on steelhead smolt. The trial court ruled, "The [environmental impact report] fails to consider . . . whether the dissolved copper discharged from the [p]roject [a]rea . . . would adversely affect restored habitat for endangered steelhead smolt."

21

In our original opinion, we reached two conclusions. First, we concluded that the entire steelhead smolt issue had been forfeited because it was not raised during the comment period. As noted, our Supreme Court held these issues were timely raised. (*Center for Biological Diversity, supra*, 62 Cal.4th at pp. 238-239.)

Second, we held that plaintiffs' dissolved copper discharge and steelhead smolt contentions were not a basis for setting aside the environmental impact report's certification. We concluded there was substantial evidence the water quality impacts were less than significant because: the steelhead smolt's habitat was below the dry gap in the Santa Clara River downstream from the project area; dissolved copper runoff is regulated by the federally adopted California Toxics Rule criteria; the dissolved copper threshold for toxicity is 32 micrograms and above per liter; utilizing the California Toxics Rule criteria, after mitigation, the dissolved copper levels will be reduced to 8.4 micrograms per liter; this contrasts with the concentrations in the Santa Clara River in the project area which range currently from 3.3 to 22.6 micrograms per liter; and even during a wet year when there would be flooding over the dry gap, the toxicity levels would be below the federally adopted California Toxics Rule criteria. In addition, we adverted to the mitigation measures SP-4.2-7 and WQ-1 which impose: ecologically friendly comprehensive project site design features; runoff source control; and monitoring of water quality in the Santa Clara River.

The environmental impact report and the department's comment responses: identify the area of the Santa Clara River watershed, 1,634 square miles; specify that the project consists of 1.4 per cent of the total Santa Clara River watershed, thereby

22

attenuating the effects of any dissolved copper runoff; describe the location and effect of the dry gap where the Santa Clara River goes underground which is 3.5 miles downstream from the project; explain that the dry gap therefore attenuates the effect any dissolved copper runoff during the dry and non-flood seasons; ; set forth the identified range of observed concentrations of dissolved copper in the Santa Clara River in the project area, 3.3 through 22.6 micrograms per liter; identify the project site's present and post-development anticipated dissolved copper concentration amounts, increasing from 7.5 to 8.4 micrograms per liter after utilizing environmentally sensitive project design features; state that this level of anticipated dissolve copper runoff, 8.4 micrograms per liter, is less than 32 micrograms per liter; explain that no steelhead smolt habitat exists above the dry gap; note that no historical records demonstrate the existence of steelhead smolt in the Santa Clara River upstream from the dry gap ; explain the buildout in the project area will entail only 5 percent of the land thereby reducing the effect of runoff in a wet year when the dry gap is breached and waters flow into the Santa Clara River's lower reaches ; note the department was justified in relying upon the California Toxics Rule; and conclude that if the dry gap is breached during a flood scenario, the project's anticipated dissolved copper runoff will be below the California Toxics Rule toxicity level.

The environmental impact report concluded: "The modeled concentrations in runoff from the [p]roject area are below all benchmark water quality objectives and criteria and [total daily maximum load] waste load allocations for the Santa Clara River and are addressed by a comprehensive site design, source control, and treatment control

23

strategy, and compliance with Standard Urban Stormwater Mitigation Plan [],

Construction General Permit, and General De-Watering Permit requirements." Hence,

the department concluded the projected runoff loads will not significantly change the

pollutant load in the Santa Clara River at the project or in its lower reaches. The

engineering corps agreed with the department's assessment. The environmental impact

report concludes, after engaging in an extensive reasoned discussion of the subject, that

the impact of dissolved copper will be less than significant. The less than significant

impact finding, when environmentally responsible design features are incorporated into

the project, is documented by the April 2008 Geosyntec Consultants study.

No doubt, plaintiffs produced contrary evidence concerning the impacts on

steelhead smolt in the lower reaches of the Santa Clara River. That plaintiffs produced

contrary evidence did not permit the trial court nor allows us to invalidate the

department's certification of the environmental impact report. As noted, we may not

reweigh the conflicting evidence and scientific analysis. (*Western States Petroleum Assn.*

*v. Superior Court*, *supra,* 9 Cal.4th at p. 572; *Environmental Council of Sacramento v.*

*City of Sacramento, supra*, 142 Cal.App.4th at p. 1042.) Having reexamined our

analysis, we thus reaffirm our prior decision. The trial court's findings in connection

with dissolved copper runoff and steelhead smolt are reversed.

24

[The balance of this opinion is to be published.]

## V.  THE SCOPE OF OUR REMAND ORDER

### A.  The Parties' Remand Arguments

The trial court ruled that six aspects of the environmental impact report were deficient and entered a stay of any construction on the project site.  The trial court ruled the following errors appeared in the environmental impact report:  the department failed to prevent the taking of the unarmored threespine stickleback as part of construction of a bridge over the Santa Clara River; the environmental impact report failed to assess the impact of project-related dissolved copper discharge when storm waters breached the dry gap; the department's analysis of mitigation measures for the San Fernando Spineflower was legally impermissible; the department's assessment of the project's greenhouse gas omissions were inadequate; the environmental impact reports assessment of the project's impact on Native American cultural resources was not supported by substantial evidence; and the environmental impact report improperly relied upon portions of the specific plan in rejecting alternatives to the project.  We reversed in their entirety the trial court's findings as to:  the effects of dissolved copper runoff on steelhead smolt; the San Fernando Spineflower preserves; Native American resources; and reliance upon the specific plan.  We have reversed in part the trial court's greenhouse gas emission findings concerning selection of a criterion of significance and its application to a business as usual scenario.  We have affirmed the trial court's greenhouse gas findings concerning the absence of substantial evidence to support the no significant impact finding.  We have

25

affirmed the trial court's findings disapproving mitigation measures BIO-44 and BIO-46 which arise from the construction of a bridge over the Santa Clara River.

After our Supreme Court issued its opinion, the developer filed a motion re remand concerning the scope of our ruling which is concurred in by the department. Plaintiffs have filed an opposition to some of the developer's arguments. The developer and the department argue our Supreme Court's opinion permits us retain jurisdiction to supervise the completion of the environmental review process. The developer argues as follows in part: "[T]he the superior court judge who heard and decided this case (Hon. Ann I. Jones) is no longer hearing mandate petitions, and this case has been reassigned to the Hon. John A. Torribio. Although Judge Torribio decided the related cases (*Friends of the Santa Clara River v. County of Los Angeles*, No. B256125, and *California Native Plant Society v. County of Los Angeles*, No. B258090, both of which are still pending before the Supreme Court as 'grant and holds' ancillary to this case, Judge Torribio is not familiar with the facts of this case (this case is never been before him.) Accordingly, remand to the superior court would necessarily result in delays that are to be avoided in [California Environmental Quality Act] litigation." In addition, the developer and the department argue that this court is intimately familiar with this case. According to the developer and the department, by retaining jurisdiction, this court's familiarity with the case will ameliorate the potential prejudice caused by the delays to date. The developer concludes: "We ask this [c]ourt to reaffirm its original holding concerning the merits of the steelhead and cultural resources claims; retain jurisdiction of the greenhouse gas and

26

unarmored threespine stickleback issues; and use [the developer's] proposed writ as a guide for this court. . . ."

Plaintiffs argue we should *not* retain jurisdiction but issue a remittitur directing the trial court to decide any remaining issues. Plaintiffs argue as follows in part. A reviewing court has the authority to act as specified in Code of Civil Procedure section 43, which states in part: "[T]he courts of appeal, may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had. In giving its decision, if a new trial be granted, the court shall pass upon and determine all the questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case. Its judgment in appealed cases shall be remitted to the court from which the appeal was taken." (See *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 701.) Further, Code of Civil Procedure section 912 states in part, "Upon final determination of an appeal by the reviewing court, the clerk of the court shall remit to the trial court a certified copy of the judgment or order of the reviewing court and of its opinion, if any." (See *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 764, 774.)

The developer and the department argue these statutory provisions which apply to appeals do not apply here. The developer and the department rely upon the general principle that litigation involving environmental impact report should be promptly concluded. (§ 21167.1, subd. (a); *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 41, 500.) More specifically, the developer and the department

27

rely upon the following portion of section 21168.9, subdivision (a) which states in part, "(a) *If a court finds, as a result of a* trial, hearing, or *remand from an appellate court*, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following. . . ." (Italics added.) The developer and the department focus upon this italicized language as the basis for its contention concerning our future obligations. Section 21168.9, subdivision (a) then identifies a series of actions that may be taken as a result of a remand from an appellate court .[2]

Section 21168.9, subdivision (b) limits the authority of a court to "include only those mandates which are necessary" to achieve compliance with the California Environmental Quality Act. Section 21168.9, subdivision (b) contains three relevant provisions. The first aspect limits the court's mandate to those matters necessary to achieve compliance with the California Environmental Quality Act, "Any order pursuant

---

[2]    Section 21168.9, subdivision (a) states in its entirety: "(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following: [¶] (1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part. [¶] (2) If the court finds that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project, a mandate that the public agency and any real parties in interest suspend any or all specific project activity or activities, pursuant to the determination, finding, or decision, that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with this division. [¶] (3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division."

28

to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division." (*Ibid.*) The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. The second aspect of section 21168.9, subdivision (b) imposes a three-fold severability requirement if only a limited portion of the proposed project is to be set aside: "However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division." (See *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1181; Kostka & Zischke, § 23.124, pp. 23-139 to 23-140.) The final aspect of section 21168.9, subdivision (b) states a trial court retains jurisdiction by way of a writ of mandate to ensure the public agency has complied with the California Environmental Quality Act, "The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division." (See *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 479.)

According to the developer and the department, section 21168.9, subdivision (a) vests this court with the power to supervise compliance our decision. This is because we have acted "as a result of a . . . remand from an appellate court. . . ." In addition, the

29

developer and the department rely upon the following language in our Supreme Court's opinion: "On remand, the Court of Appeal shall decide whether, in light of our exhaustion holding, the Native American cultural resource and steelhead smolt claims warrant reexamination on the merits. The Court of Appeal shall further decide, or remand for the superior court to decide, the parameters of the writ of mandate to be issued. (See § 21168.9.)" (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 240.) According to the developer and the department, our Supreme Court's language and section 21168.9, subdivision (a) give us the authority to issue our own writ of mandate and supervise compliance therewith.

B. Standard of Review and the Presence of Ambiguous Statutory Language

We are construing the effect of section 21168.9, subdivision (a) to our situation. Our Supreme Court has explained: "When construing a statute, we look first to its words, "'because they generally provide the most reliable indicator of legislative intent." [Citation.] We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' (*Pineda v. Williams-Stores, Inc.* (2011) 51 Cal.4th 524, 529-530.)" (Accord, *In re Ethan C.* (2012) 54 Cal.4th 610, 627.) According to our Supreme Court: "'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.] 'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.' [Citation.]" (*Pineda v. Williams-Stores, Inc.,* *supra,* 51 Cal.4th at p. 530; see *In re Ethan C., supra,* 54 Cal.4th at p. 627.)

30

As noted, the developer and the department focus upon the language in section 21168.9, subdivision (a). The rely on the language that "as a result of . . . remand from an appellate court" and argue we may issue a writ of mandate. As noted, section 21168.9, subdivision (a)(1) through (a)(3) specifies potential aspects of the "court['s]" writ of mandate. Hence, they argue, we are the "court" that has the authority to issue the writ of mandate directed at the department. We are satisfied that the term "appellate court" in our context is subject to some ambiguity. Although the term appellate court generally refers to the Court of Appeal or an appellate division, our Supreme Court decides appeals. And it can be logically argued that when the Supreme Court remands an appeal as it did here, section 21168.9, subdivision (a) permits us to issue a writ of mandate. The developer and the department add to this textual analysis by adverting to the need for prompt resolution California Environmental Quality Act litigation. (§ 21167.1, subd. (a) ["In all actions or proceedings brought pursuant to Sections 21167, 21168, and 21168.5, including the hearing of an action or proceeding on appeal from a decision of a lower court, all courts in which the action or proceeding is pending shall give the action or proceeding preference over all other civil actions, in the matter of setting the action or proceeding for hearing or trial, and in hearing or trying the action or proceeding, so that the action or proceeding shall be quickly heard and determined."]; *Stockton Citizens for Sensible Planning v. City of Stockton, supra,* 48 Cal. 4th 481, 500 ["'The Legislature has obviously structured the legal process for a [California Environmental Quality Act] challenge to be speedy, so as to prevent it from degenerating into a guerilla war of attrition by which project opponents wear out project

31

proponents.'"].) And the Courts of Appeal do have original mandate jurisdiction. (Cal. Const., art. VI, § 10 ["The . . . courts of appeal . . . and their judges have original jurisdiction in . . . proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition."]; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 241 [original proceeding filed in Court of Appeal and transferred to our Supreme Court].) In light of the foregoing, we will evaluate the circumstances leading up to the enactment of section 21168.9, subdivision (a) and its reference to a remand from an appellate court.

C. Limited Legislative History Concerning Section 21168.9

Section 21168.9 was introduced as Senate Bill No. 1079 (1983-1984 Reg. Sess.) (Sen. Bill No. 1079). When originally introduced on March 4, 1983, Senate Bill 1079 made no reference to the issue of the scope of a writ of mandate to be issued in an environmental case. Rather, when originally introduced, Senate Bill No. 1079 related to costs of suit and attorney fees in environmental litigation involving low or moderate income housing projects. (Sen. Bill No. 1079 as introduced Mar. 4, 1983; Sen. Com. on Housing and Urban Affairs, rep. on Sen. Bill No. 1079, Mar. 4, 1983, p. 1.) Later, while still initially pending in the upper house, Senate Bill No. 1079 was amended to address other zoning, public planning issues and environmental matters.

On July 25, 1983, Robert K. Break of the law firm of Latham & Watkins wrote a letter to Maxine Harris Brookner. Mr. Break's letter proposed an amendment to the California Environmental Quality Act. Mr. Break's letter was received while Senate Bill No. 1079 was under consideration in the upper house. Ms. Brookner was a Senate Committee on Housing and Urban Affairs staffer. Mr. Break requested that legislation be

32

adopted providing for greater flexibility when selecting remedies in the case of a California Environmental Quality Act violation. Mr. Break argued the California Environmental Quality Act should be amended to provide more focused remedies other than entirely voiding and environmental decision. Mr. Break wrote to Ms. Harris: "[G]iven the cost associated with the delay of any public or private works project and the sensitivity of many such projects to any delay, I think it is appropriate to consider some statutory direction to the courts recognizing there are appropriate situations where the relief granted upon a finding of [a California Environmental Quality Act] violation should be something less drastic than mandated voidance of the decision approving the project. In many situations, an expedited reconsideration of the decision by the lead agency under court supervision could minimize delay while fully meeting the letter and intent of [the California Environmental Quality Act]." Thereafter, Senate Bill No. 1079 passed the upper house. No action was taken at this time on Mr. Break's letter.

On May 8, 1984, Senate Bill No. 1079, while pending in the Assembly, was amended to propose the adoption of section 21168.9. As it did later upon ultimate passage, the newly drafted Legislative Counsel's Digest stated in part: "The act specifies procedures and requirements to challenge a determination, finding, or decision of a public agency under the act, including petitions to the court for an order of administrative mandate, as specified. [¶] This bill would require a court, if it finds, as a result of a trial, hearing, or remand from an appellate court that a determination, finding, or decision of a public agency has been made without compliance with the California Environmental Quality Act, to enter an order by the issuance of a peremptory writ of mandate including

33

one or more specified orders specifying what action by the public agency is necessary to comply with the act. . . . [¶] . . . The bill would require the court to retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with the act. The bill would also declare that its provisions do not authorize a court to direct any public agency to exercise its discretion in any particular . . . way." (Italics deleted.) As can be noted, in terms of the remand from an appellate court language, the Legislative Counsel's Digest endeavors to summarize the text appearing in section 21168.9, subdivision (a). The Assembly adopted the entirely rewritten Senate Bill No. 1079 and returned it to the upper house on May 29, 1983. The Legislative Counsel's Digest is the only document prepared while the legislation was pending in the Assembly that sheds any light on Legislature's intentions in enacting Senate Bill No. 1079.

Only one Senate committee report discusses the language of section 21168.9, subdivision (a) after Senate Bill No. 1079 was amended in the Assembly. An unfinished business report prepared by the Senate Democratic Caucus reiterated the language concerning "remand from an appellate court" but shed no light on the subject. (Sen. Democratic Caucus, unfinished business rep. on Sen. Bill No. 1079 as amended May 8, 1984, June 7, 1983, pp. 1-2.) On June 21, 1984, the Senate unanimously refused to concur in the Assembly amendments which in essence rewrote Senate Bill No. 1072 to propose section 21168.9. (7 Sen. Journal (1983-1984 Reg. Sess.) p. 12134.) A Conference Committee was appointed which recommended adoption of the Assembly amendments to Senate Bill No. 1079 which proposed enactment of section 21168.9.

34

Both the Senate and Assembly unanimously adopted the Conference Committee report and both houses unanimously voted to enact section 21168.9. (10 Assem. J. (1983-1984 Reg. Sess.) p. 19010; 8 Sen. J. (1983-1984 Reg. Sess.) p. 14273.) There is little of consequence in the committee reports or other legislative documents that sheds light on the Legislature's expectations in enacting the remand from an appellate court language. More critically, nothing in the Senate Bill No. 1079's sparse legislative history of which alters the normal processing of environmental litigation on direct appeal as is our case here. Nothing in Senate Bill No. 1079's legislative documents suggest intermediate appellate courts were granted, in cases on direct appeal, authority to issue their own writ of mandate. And nothing in those papers suggest a legislative intention, when a case is on direct appeal, to grant us the authority to supervise the implementation of a writ of mandate.

D. Other Provisions of the California Environmental Quality Act and Appellate Practice Militate Against Holding that on Direct Appeal We May Issue a Writ Of Mandate and Supervise Its Implementation.

1. Other legal provisions concerning trial court jurisdiction over California Environmental Quality Act enforcement and administrative mandate procedure

Other legal and procedural provisions are inconsistent with the legislative intent to permit an appellate court, on direct appeal, to issue a writ of mandate directly to the lead agency. First, we examine California Environmental Quality Act enforcement practice in 1984 when section 21168.9 was enacted. Since 1972, if a litigant desires to challenge an environmental impact report's certification, the Legislature has required a Code of Civil

35

Procedure section 1094.5 administrative mandate petition be filed.  And the practice has always been to file a Code of Civil Procedure section 1094.5 administrative mandate petition in superior court.  In 1970, the California Environmental Quality Act was adopted with the enactment of new sections 2000 through 21151.  (Stats. 1970, ch. 1433, § 1, pp. 2780-2783.)  Former section 21100, subdivision (a) required a "detailed statement by a responsible state official" be written describing a proposed action's environmental impact.  The 1970 legislation made no reference to judicial enforcement of the new environmental legislation.  In 1972, sections 21060 through 21172.5 were adopted which substantially amended the 1970 version of the California Environmental Quality Act.  (Stats. 1972, ch. 1154, § 1, pp. 2271-2280.)  Former section 21168 required that any action challenging a public agency's determination under the California Environmental Quality Act must be filed in accordance with Code of Civil Procedure section 1094.5.  (Stats., ch. 1154, § 15, p. 2278.)

As it was in effect in 1972, Code of Civil Procedure section 1094.5 had language which was solely consistent with the filing of administrative mandate petitions in the trial court.  (Stats.1949, ch. 358, § 1, pp. 638-639.)  For example;  former Code of Civil Procedure section 1094.5, subdivision (a) required that the petition be heard by "the court sitting without a jury"; referred to the filing of the "respondent's points and authorities" along with the administrative record (Code Civ. Proc., § 1094.5, subd. (a)); the entry of judgment (Code Civ. Proc., § 1094.5, subds. (d)(-(e)); the potential entry of an order staying the administrative decision until the filing of a notice of appeal (Code Civ. Proc.,

36

§ 1094.5, subd. (f); specifying the duration of the stay by operation of law after the filing of a notice of appeal. (Code Civ. Proc., § 1094.5, subd. (f).)

And any filing in a trial court would have been the superior court. In 1972, neither the municipal or justice courts had jurisdiction to hear administrative mandate petitions. As can be noted, this language is inconsistent with the direct filing of a Code of Civil Procedure section 1094.5 administrative mandate petition in an appellate court. (As we will explain later, we do not foreclose that possibility. But our point is that the practice in 1984 when section 21168.9 was enacted was for administrative mandate petitions to be filed in the superior court.)

We now turn to the legislative events in 1984 when section 21168.9, with its remand from an appellate court language, was adopted. The 1984 version of Code of Civil Procedure section 1094.5, the enforcement provision for California Environmental Quality Act, continued with the references to: a "court sitting without a jury"; "respondent's points and authorities"; the entry of a judgment; and stays pending appeal. (Code Civ. Proc., § 1094.56, subds. (a), (e), (f). (g)(3), and (h)(3); Stats. 1982, ch. 812, § 3, pp. 3103-3105.) Code of Civil Procedure section 86 in 1984 specified the jurisdiction of the justice and municipal courts. The 1984 amended version of Code of Civil Procedure section 86 did not vest the municipal or justice courts with jurisdiction over California Environmental Quality Act litigation. Nor did the 1984 version of Code of Civil Procedure section 86 vest those courts with the authority to rule on a Code of Civil Procedure section 1094.5 administrative mandate petition. (Stats. 1984, ch. 1719, § 1.1, pp. 6229-6231.)

37

No statute explicitly provided for filing a mandate petition to challenge an environmental impact report certification in the Courts of Appeal. Section 21168.6 specified, as it does now, that a mandate petition "against the Public Utilities Commission" involving California Environmental Quality Act compliance must be filed in the Supreme Court. (Stats. 1972, ch. 1154, § 1, p. 2278.) Also, in 1984, the Legislature adopted section 21167.6, subdivisions (a) through (c)[3] which imposed time requirements for the filing of the administrative record with the court. The sole exception was for suits against the Public Utilities Commission. (Stats 1984, ch. 1514, § 12, pp. 5342-5343.) But as adopted in 1984, section 21167.6, subdivision (d) also imposed time limits for the preparation of a clerk's transcript on appeal. And, section 21167.6, subdivision (d) permitted the use of an appendix on appeal. And section 21167.6,

---

[3]     As adopted in 1984, section 21776.8, subdivisions (a) through (c), the provisions relating to the filing of the administrative record with the "court," stated: "Notwithstanding any other provision of law, in all actions brought pursuant to Section 21167, except those involving the Public Utilities Commission: [¶] (a) At the time the action is filed, the petitioner shall file a request that the respondent public agency prepare the record of proceedings relating to the subject of the action. The request, together with the petition, shall be served upon the public agency not later than 10 business days after the action is filed. [¶] (b) The public agency shall prepare and certify the record of proceedings not later than 60 days after the request specified in subdivision (a) is served upon the public agency. The parties shall pay any costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court. The petitioner may elect to prepare the record of proceedings or the parties may agree to an alternative method of preparation of the record of proceedings, subject to the certification of its accuracy by the public agency, within the time specified in this subdivision. [¶] (c) The time limit established by subdivision (b) may be extended only upon stipulation of all parties will been properly served in the action or upon order of the court. Extensions shall be liberally granted by the court when the size of the record of proceedings renders infeasible compliance with the time limits specified in subdivision (b) There is no limit on the number of extensions which may be granted by the court, but no single extension shall exceed 60 days unless the court determines that a longer extension is in the public interest." (Stats. 1984, ch. 1514, § 12, pp. 5342-5343.)

38

subdivisions (d) through (f) imposed limits on briefing and scheduling requirements *on appeal*. (Stats. 1984, ch. 1514, § 12, p. 5343.[4]) The 1984 legislative record indicates the Legislature was aware, when section 21168.9 was adopted, that the practice was for environmental impact report litigation to be commenced in the superior court.

2. Appellate courts' powers and practice on direct appeal

There is no evidence the Legislature intended when an environmental impact report's certification was litigated on appeal to alter the established procedures for remitting jurisdiction of the trial court. As noted, now, as in 1984, an appellate court's authority extended to affirmance or reversal and modification of an appeal from judgment or order. (Code Civ. Proc., § 43.) And after making one of those decisions, affirmance, reversal, modification or any combination thereof, the Courts of Appeal are required remit the cause to court from which the appeal was taken. (*Ibid*.; Code Civ. Proc., § 912; see *Griset v. Fair Political Practices Com.*, *supra*, 25 Cal.4th at p. 701.) These are well established principles of appellate practice. The Legislature did not expressly change these rules in the case of environmental litigation. When section 21168.9, subdivision (a) was adopted, the Legislature did not expressly grant us the power to issue a writ of mandate.

---

[4] As adopted in 1984, section 21167.6, subdivision (d), the provision relating to preparation of the record on *appeal*, stated: "(d) The clerk of the superior court shall prepare and certify the clerk's transcript on appeal not less than 60 days after the notice designating the papers or records to be included in the clerk's transcript is filed with the Superior Court, provided that the party or parties may pay any costs or fees for preparation of the clerk's transcript imposed in conformance with any law or rules of court. Nothing in contained in this subdivision shall preclude election to proceed pursuant to Rule 5.1 of the California Rules of Court."

And, there is no basis for *implying* the Legislature intended in enacting section 21168.9 to modify the well-established procedures for appeals digested in the immediately foregoing paragraph. Stated differently, we may not imply a repeal or modification of the Code of Civil Procedure sections 43 and 912 remittitur requirements because of the enactment of section 21168.9. Repeals by implication are disfavored. (*People v. Siko* (1988) 45 Cal.3d 820, 824 ["As a general rule of statutory construction, of course, repeal by implication is disfavored."]; *Flores v. Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 171, 176 ["[A]ll presumptions are against a repeal by implication."].) Our Supreme Court has explained: "Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation."'" (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476-477, quoting *In re White* (1969) 1 Cal.3d 207, 212.)

This presumption against the implied repeal of Code of Civil Procedure sections 43 and 912 is of special emphasis given the historic nature of the structure of the California appellate process. In 1850, the Legislature specified the powers of the Supreme Court and the role of the remittitur, "The Supreme Court may reverse, affirm, or modify, the judgment or order appealed from, and its judgment shall be remitted as soon as practicable, after judgment pronounced, to the Court below, to be enforced according to law." (Stats. 1850, ch. 14, § 7, p. 57; see *Grogan v. Ruckle* (1850) 1 Cal. 193, 194.) Later in 1850, the Legislature enacted "AN ACT to regulate proceedings in Civil Cases

40

in the District Court, the Superior Court of the City of San Francisco, and Supreme Court which: reiterated the power of the Supreme Court to "reverse, affirm, or modify any judgment, order or determination, appealed from in whole or in part"; directed that the Supreme Court's judgment or order "be remitted to the District Court"; and required, "When the judgment of the Supreme Court is remitted to the Court below, the clerk of the Supreme Court shall certify the costs of the appeal . . . ." (Stats. 1850, ch. 142, §§ 280, 283, pp. 428, 454.) In 1851, the Legislature once again defined the powers of the Supreme Court thusly, "This Court may reverse, affirm, or modify the judgment or order appealed from, in the respect mentioned in the notice of appeal, as to any and all of the parties, and may set aside, confirm, or modify any or all of the proceedings subsequent to, and dependent upon, such judgment or order; and may, if necessary or proper, order a new trial." (Stats. 1851, ch. 1, § 8, p. 10.)

The Code of Civil Procedure was enacted in 1872. (See *First Nat. Bank of Santa Ana v. Kinslow* (1937) 8 Cal.2d 339, 343; *Hogoboom v. Superior Court* (1996) 51 Cal.App.4th 653, 660.) As enacted in 1872, Code of Civil Procedure section 45 stated: "The Court may reverse, affirm, or modify any order or judgment appealed from, and may direct the proper judgment or order to be entered, or direct a trial or further proceeding be had. Its judgment must be remitted to the Court from which the appeal was taken." (1 Ann. Code Civ. Proc., § 45 (1st ed. 1872, Haymond & Burch, commrs-annotators) p. 49.) In 1880, former Code of Civil Procedure section 45 was moved to section 53. The 1880 version of former Code of Civil Procedure section 45 maintained the "affirm, reverse, or modify" language and concluded, "Its judgment in appealed cases

41

shall be remitted to the Court from which the appeal was taken." (Stats. 1880, ch. 35, § 53, p. 25 (Amends. to Codes).) In 1933, former Civil Procedure section 53 was amended to clarify that the power "to affirm, reverse, or modify" extended to the Court of Appeal. As in the case of the 1880 version, the 1933 amendment explicitly stated the judgment in an appealed case was to be remitted to the trial court. (Stats.1933, ch. 743, § 6, p. 1807.) In 1967, former Civil Procedure section 53 was renumbered as section 43 and enacted to state as it does now. (Stats. 1967, ch. 17, § 5, p. 827.) Since 1850, the powers of appellate courts have been limited "to affirm, reverse, or modify" judgments or orders and the decision on appeal is to be remitted to the trial court.

Finally, the department and developer argue that we should somehow supervise compliance with any writ of mandate we can issue. Section 21168.9, subdivision (b) explains who retains jurisdiction to supervise a writ of mandate issued to enforce compliance with the California Environmental Quality Act, "The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division." The Legislature has explicitly vested the trial court with the authority to retain jurisdiction to ensure the department has complied with the California Environmental Quality Act. Any suggestion we can retain jurisdiction to supervise any return to the writ of mandate is contradicted by the express language of section 21168.9, subdivision (b).

E. Conclusion

Nothing in the language of 21168.9, subdivision (a), the events leading to its adoption or other provisions of law permit us, *on direct appeal*, to issue the writ of

42

mandate. That is a matter for a trial court. For the foregoing reasons, we conclude we do not have the authority to issue our own writ of mandate. Rather, our duty is to decide issues pertinent to the writ of mandate's scope, insofar as possible, and then remit the matter to the trial court. And we further conclude our Supreme Court directed us to determine what language should be utilized by the trial court.

Nothing we have said herein applies to cases where an original proceeding is initially commenced in the Court of Appeal. (Cal. Const., art. VI, § 10; see *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 340.) No original proceeding has been filed with this court. Similarly, we are not discussing specified environmental challenges filed against the Public Utilities Commission which are filed in our Supreme Court. (§21168.6.) Further, nothing we have said applies to cases where a supersedeas petition is filed and conditions are imposed which can lead to an early compliance with environmental requirements. (Cal. Rules of Court, rule 8.112(d)(1) ["The court may issue the writ on any conditions it deems just."]**;** *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 802-814 [supersedeas petition deemed to be mandate petition and the Court of Appeal issued a writ of mandate ordering preparation of an environmental impact report and limiting ground water pumping].) No supersedeas petition has been filed with us. Finally, in a related supersedeas scenario, nothing we have written applies to issue of injunctions designed to preserve the status quo so as to maintain the jurisdiction of this court. (Code Civ. Proc., § 923 ["The provisions of this chapter shall not limit the power of a reviewing court or of a judge thereof to stay proceedings during the pendency of an appeal or to issue a writ of supersedeas or to suspend or modify an injunction during the pendency of

an appeal or to make any order appropriate to preserve the status quo, the effectiveness of the judgment subsequently to be entered, or otherwise in aid of its jurisdiction."]; *People ex rel. S. F. Bay etc. Com. v. Town of Emeryville* (1968) 69 Cal.2d 533, 537 [Supreme Court's inherent powers permit it to issue an injunction in aid of its own jurisdiction and to preserve the status quo]; *County of Inyo v. City of Los Angeles* (1976) 61 Cal.App.4th 91, 100-101 [Court of Appeal uses injunctive order powers to reset an interim pumping rate from the subsurface pool of the Owens Valley Groundwater Basin].) No specific injunctive relief request has been presented to us. This is not merely a case involving an injunction but the: certification of an environmental impact; approval of a streambed alteration agreement; approval of the resource management and development plan; adoption of the Spineflower Conservation Plan and streambed alteration agreement; and issuance of two incidental take permits. Our analysis is limited to the argument that, based on section 21168.9, we should issue a writ of mandate and supervise the department's compliance therewith. Section 21168.9 does not empower us to do so.

Upon remittitur issuance, the trial court is to proceed in compliance with section 21168.9. We have reversed the judgment except as to the greenhouse gas emission and BIO-44 and BIO-46 issues. This will entail at a minimum setting aside those two portions of the environmental impact report. But beyond that, we leave further matters in the trial court's good hands. Whether to maintain the injunction against *any* development in effect or partially certify the environmental impact report depends on competing factual issues including section 21168.9, subdivision (b) severance issues. (*LandValue 77 LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675,

44

680-683; *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173-1181.) One of the issues, changing the bridge design over the Santa Clara River so *no* threespine unarmored stickleback are taken, may be a comparatively uncomplicated engineering decision. But the other issue, the greenhouse gas emission question may be very complicated. (See *Center for Biological Diversity, supra*, 62 Cal.4th at pp. 225-231.) It is speculatively injudicious for us to decide these matters and that is why the scope of our remittitur is narrowly drawn.

## VI.  DISPOSITION

The judgment is affirmed in part and reversed in part. First, the judgment is affirmed as to the finding that mitigation measures BIO-44 and BIO-46 violate Fish and Game Code section 5515. Second, the judgment is reversed as the finding that the selection of the Health and Safety Code section 38850 greenhouse gas emission reduction goals was an abuse of discretion. Upon remittitur issuance, the trial court shall find the department could select the Health and Safety Code section 38850 greenhouse gas emissions reduction goals as a significance criterion. Third, the judgment is reversed as to the finding that the department could not use a hypothetical business as usual scenario for evaluating greenhouse gas emission impacts. Upon remittitur issuance, the trial court is to enter a finding that the department can use a hypothetical business as usual scenario for evaluating greenhouse gas emission impacts. Fourth, the judgment is affirmed as to the trial court's ruling there is no substantial evidence the project's greenhouse gas emissions will not result in a cumulatively significant environmental impact. Upon remittitur issuance, the trial court is to enter a finding that the there is no substantial

45

evidence the project's greenhouse gas emissions will not result in a cumulatively significant environmental impact. Fifth, the trial court's remaining findings concerning Native American resources, San Fernando Spineflower conservation, reliance on the specific plan and steelhead smolt are reversed. Once the remittitur issues, the trial court is to issue its writ of mandate as specified in parts II, III and IV(E). Further, the trial court is to proceed in compliance with Public Resources Code section 21168.9 including fashioning appropriate injunctive orders including any changes to the permits if necessary. All parties are to bear their own costs of appeal.

CERTIFIED FOR PARTIAL PUBLICATION


TURNER, P. J.


We concur:



KRIEGLER, J.



BAKER, J.

46